No. 25-2004

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES, *et al.*,

Plaintiffs-Appellants,

v.

JUDGE MATTHEW JAMES MADDOX, *et al.*,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Maryland

BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant
  Attorney General*

DREW C. ENSIGN
  *Deputy Assistant Attorney
  General*

ELIZABETH HEDGES
SARAH WELCH
  *Counsel to the Assistant Attorney
  General
  Civil Division*

  *U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (771) 209-1978
  Elizabeth.T.Hedges@usdoj.gov*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION.............................................................4

STATEMENT OF THE ISSUES.................................................................5

PERTINENT STATUTES AND REGULATIONS ........................................5

STATEMENT OF THE CASE ....................................................................5

        A.     Statutory Background .....................................................5

        B.     Factual Background ........................................................7

        C.     Procedural Background...................................................15

SUMMARY OF ARGUMENT ..................................................................18

STANDARD OF REVIEW ......................................................................26

ARGUMENT..........................................................................................26

    I.     The District of Maryland Mooted This Prospective Challenge to the Standing Orders by Materially Amending and Withdrawing Them...........................................................26

    II.    The District Court Erred by Rejecting This Procedurally Proper Facial Challenge to a Court Rule.................................30

        A.     The United States has an equitable cause of action to enjoin an unlawful court rule ..........................................31

        B.     Judicial immunity does not bar the claims against the judges and clerk ............................................................35

        C.     The government has standing to seek injunctive relief ...........................................................................43

        D.     Appeals or mandamus in individual cases are no substitute for this action ...............................................48

    III.    The Standing Orders Were Unlawful .......................................52

i

A.    The Standing Orders required preliminary equitable relief to be granted without satisfying the minimum legal requirements.........................................................52

B.    The Standing Orders operated without regard to district courts' limited authority in immigration matters ........................................................................55

C.    The Standing Orders were promulgated without compliance with the procedural requirements for local rules ................................................................58

CONCLUSION.................................................................................59

CERTIFICATE OF COMPLIANCE.............................................. 61

CERTIFICATE OF SERVICE.......................................................62

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Antoine v. Atlas Turner, Inc.*,
66 F.3d 105 (6th Cir. 1995) .................................................................. 58

*Arizona v. United States*,
567 U.S. 387 (2012) ................................................................. 20, 32

*Ass'n of Am. R.R. v. Hudson*,
144 F.4th 582 (4th Cir. 2025) .............................................................. 49

*Baylson v. Disciplinary Bd. of Sup. Ct. of Pa.*,
764 F. Supp. 328 (E.D. Pa. 1991) .......................................................... 59

*Baylson v. Disciplinary Bd. of Sup. Ct. of Pa.*,
975 F.2d 102 (3d Cir. 1992) .......................................................... 58, 59

*Bolin v. Story*,
225 F.3d 1234 (11th Cir. 2000) ............................................................ 36

*Brown v. Crawford Cnty.*,
960 F.2d 1002 (11th Cir. 1992) ...................................................... 53, 58

*Brusznicki v. Prince George's Cnty.*,
42 F.4th 413 (4th Cir. 2022) ...................................................... 19, 27, 28

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................................... 33

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943) ........................................................................... 40

*Buscemi v. Bell*,
964 F.3d 252 (4th Cir. 2020) .............................................................. 45

*Butz v. Economou*,
438 U.S. 478 (1978) ................................................................ 23, 40, 41

*Carter v. Clark*,
616 F.2d 228 (5th Cir. 1980) .............................................................. 30

*Castendet-Lewis v. Sessions*,
855 F.3d 253 (4th Cir. 2017) .............................................................. 28

*Chafin v. Chafin,*
    568 U.S. 165 (2013)......................................................44, 45

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)............................................................46

*D.C. Ct. of Appeals v. Feldman,*
    460 U.S. 462 (1983)..........................................................40

*Davis v. United States,*
    564 U.S. 229 (2011)......................................................24, 44

*DHS v. Thuraissigiam,*
    591 U.S. 103 (2020)........................................................7, 57

*Forrester v. White,*
    484 U.S. 219 (1988) ......................................................21, 35

*Gamble v. United States,*
    587 U.S. 678 (2019)..........................................................40

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ...................................................... 7, 56

*Gibson v. Goldston,*
    85 F.4th 218 (4th Cir. 2023) .......................................17, 36, 58

*Heckman v. United States,*
    224 U.S. 413 (1912) ..........................................................32

*Hernandez Escalante v. Noem,*
    No. 25-1799 (D. Md.) .....................................................14, 15

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,*
    14 F.4th 322 (4th Cir. 2021).......................................... 18, 29

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010)..........................................................59

*In re Capitol Broad. Co., Inc.,*
    19 F.4th 385 (4th Cir. 2021)................................................48

*In re Debs,*
    158 U.S. 564 (1895)......................................... 2, 20, 31, 32

*In re Musk,*
    --- F.4th ---, 2026 WL 626965 (4th Cir. Mar. 4, 2026) ....................42, 49

iv

*In re United States,*
    194 U.S. 194 (1904) ............................................................... 33

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) ............................................................... 57

*Mapoy v. Carroll,*
    185 F.3d 224 (4th Cir. 1999) ............................................. 6, 57

*Miranda v. Garland,*
    34 F.4th 338 (4th Cir. 2022) .................................................. 57

*Mullis v. U.S. Bankr. Ct. for Dist. of Nevada,*
    828 F.2d 1385 (9th Cir. 1987) ................................................ 36

*Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Holder,*
    2015 WL 13158479 (D. Md. Aug. 18, 2015) ............................ 31

*Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Roberts,*
    180 F. Supp. 3d 46 (D.D.C. 2015) .......................................... 31

*N.Y. State Rifle & Pistol Ass'n v. City of New York,*
    590 U.S. 336 (2020) .............................................................. 27

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................... 52, 53, 54

*Powell v. McCormack,*
    395 U.S. 486 (1969) .............................................................. 45

*Pulliam v. Allen,*
    466 U.S. 522 (1984) ................................... 2, 21, 22, 35, 37, 38, 39, 42, 43

*R.R. Comm'n of Tex. v. Pullman,*
    312 U.S. 496 (1941) .............................................................. 40

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ........................................................... 6, 57

*Rooker v. Fidelity Tr.,*
    263 U.S. 413 (1923) .............................................................. 40

*Russell v. Hug,*
    275 F.3d 812 (9th Cir. 2002) ............................................ 19, 30

*Sanitary Dist. of Chi. v. United States,*
    266 U.S. 405 (1925) .............................................................. 32

*Sheldon Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*,
53 F.3d 1349 (1st Cir. 1995)........................................30, 49, 50

*Shoop v. Twyford*,
596 U.S. 811 (2022)............................................................. 55

*Steel Co. v. Citizens for Better Env't*,
523 U.S. 83 (1998) ............................................................. 44

*Stephens v. Herring*,
827 F. Supp. 359 (E.D. Va. 1993)........................................ 36

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*,
214 F.3d 4 (1st Cir. 2000) ............................................. 19, 30

*Talley v. Folwell*,
133 F.4th 289 (4th Cir. 2025) ............................................. 26

*Thaw v. Lynch*,
2016 WL 1045527 (D. Ariz. Mar. 16, 2016)............................30

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...................................................... 46, 47

*U.S. Bancorp Mort'g Co. v. Bonner Mall P'ship*,
513 U.S. 18 (1994) ............................................................. 29

*United States v. Am. Bell Tel. Co.*,
128 U.S. 315 (1888) ........................................................... 32

*United States v. City of Jackson*,
318 F.2d 1 (5th Cir. 1963)................................................... 32

*United States v. Fed. Maritime Comm'n*,
694 F.2d 793 (D.C. Cir. 1982) ............................................. 33

*United States v. Hall*,
145 F.2d 781 (9th Cir. 1944)................................................ 34

*United States v. Interstate Commerce Comm'n*,
337 U.S. 426 (1946)....................................................... 21, 33

*United States v. Munsingwear, Inc.*,
340 U.S. 36 (1950) ........................................................... 4, 17

*United States v. San Jacinto Tin Co.*,
125 U.S. 273 (1888)............................................................ 32

*United States v. Severens*,
  71 F. 768 (6th Cir. 1896)..........................................................34

*United States v. Texas*,
  143 U.S. 621 (1892) ...............................................................32

*United States v. Texas*,
  599 U.S. 670 (2023) .......................................................... 46, 47

*United States v. U.S. Dist. Ct. (In re United States)*,
  791 F.3d 945 (9th Cir. 2015)...................................................34

*United States v. United States*,
  417 F. Supp. 851 (D.D.C. 1976)...............................................33

*United States v. Zingsheim*,
  384 F.3d 867 (7th Cir. 2004) ............................................. 50, 51

*Valero Terrestrial Corp. v. Paige*,
  211 F.3d 112 (4th Cir. 2000)...................................................29

*Virginia v. Tenneco, Inc.*,
  538 F.2d 1026 (4th Cir. 1976) ................................................48

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ...................................................... 21, 35, 37

*Winter v. NRDC*,
  555 U.S. 7 (2008) ..................................................................52

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967) ......................................................... 20, 31

*Younger v. Harris*,
  401 U.S. 37 (1971)..................................................................40

## Statutes

28 U.S.C. § 1291..........................................................................5

28 U.S.C. § 1331..........................................................................4

28 U.S.C. § 2071(a)....................................................................58

28 U.S.C. § 2071(b)....................................................................59

28 U.S.C. § 2071(c)....................................................................59

28 U.S.C. § 2077 ........................................................................59

8 U.S.C. § 1226(e) ....................................................................7, 57

8 U.S.C. § 1229a ........................................................................ 56

8 U.S.C. § 1252(a)(5) ................................................................. 56

8 U.S.C. § 1252(b)(9) ............................................................. 6, 56

8 U.S.C. § 1252(e)(2) .................................................................7, 57

8 U.S.C. § 1252(f)(1) ...........................................................7, 47, 56

8 U.S.C. § 1252(g) ................................................................. 6, 57

8 U.S.C. § 1231.......................................................................... 56

## Rules

Fed. R. Civ. P. 65(a)(1) .............................................................. 54

Fed. R. Civ. P. 65(b)(1) .............................................................. 54

Fed. R. Civ. P. 65(b)(2) .............................................................. 54

Fed. R. Civ. P. 65(c) .................................................................. 55

Fed. R. Civ. P. 65(d)(1) .............................................................. 55

Fed. R. Civ. P. 65(d)(2) .............................................................. 55

Fed. R. Civ. P. 83(a)(1) .............................................................. 59

## Other Authorities

United States District Court for the District of Maryland, *Proposed Amendments to the Local Rules* ............................................................. 16

United States District Court for the District of Maryland, *Proposed Second Amended Standing Order 2025-01 (with edits shown)* .......................... 16

United States District Court for the District of Maryland, *Second Amended Standing Order 2025-01* ............................................................. 17

United States District Court for the District of Maryland, *Standing Orders* ............................................................. 17

viii

## INTRODUCTION

Last May, the District of Maryland and its judges (together with the defendant clerk, Appellees) issued a new, first-of-its-kind, across-the-board rule restricting the Executive Branch's execution of the immigration laws. Taking the form of a Standing Order, the rule operated to grant an automatic stay of removal for any alien who simply filed a habeas petition in the District of Maryland, whether or not the petitioner requested a stay and whether or not the petitioner was likely to succeed on the merits or otherwise met the requirements for equitable relief. The Standing Order (and a slightly revised version issued days later—together, the Standing Orders) was both procedurally and substantively unlawful. Appellees issued it in violation of statutory and regulatory requirements for issuing local rules, and its terms simultaneously exceeded district-court jurisdiction over immigration cases and Federal Rule of Civil Procedure 65's limits on injunctive relief.

Because Appellees acted unlawfully in imposing a rule that harmed the Executive Branch's enforcement of federal law, the United States (hereinafter the government) sued to seek relief from the unlawful rule. Invoking a longstanding equitable cause of action, the government filed an action seeking prospective injunctive relief against the district court and its judges in their official capacities. That is how the system is supposed to work.

1

Courts and judges are not above the law, and the government properly sought judicial relief as the remedy for an unlawful rule.

Despite recognizing that the government's merits objections to the Standing Orders "might well get some traction" if "made in the proper forum," JA175, the district court granted Appellees' motion to dismiss on threshold grounds. In doing so, it made three critical, reversible legal errors.

*First*, the court held that the government lacked a cause of action to bring this lawsuit. That is mistaken: the Supreme Court has long permitted the United States to seek prospective equitable relief to protect its sovereign interests. *In re Debs*, 158 U.S. 564, 582 (1895). That is the cause of action that the government uses, for example, when States interfere with federal functions, and there is no sound reason why it should not be available here. *Second*, the district court believed that judicial immunity barred the claims against the judges and clerk. That is also clearly wrong. The Supreme Court specifically held that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984). *Finally*, the court held that the government lacked standing to seek injunctive relief against the Standing Orders. But that too is flatly incorrect. The Standing Orders imposed concrete harm on the government by interfering with its enforcement of

2

immigration law, and invalidating the Standing Orders would redress that harm; nothing more is required.

The cumulative effect of the district court's rulings on these three issues is that a federal district court could adopt illegal orders that would be shielded from *any* judicial review. For example, if a district court imposed an allegedly unlawful prerequisite on the filing and docketing of lawsuits, parties could not challenge that prerequisite by appeal (because their case would not be docketed, and there would be no appealable order). They also could not challenge it by mandamus if the unlawfulness of the prerequisite was not clear and indisputable (for example, if it involved a debatable interpretation of a statutory pre-filing requirement). It is only the ability to seek prospective injunctive relief that would permit judicial review in such circumstances. For similar reasons, in this analogous situation, the government had little option other than to bring a suit for such relief. For example, mootness issues with respect to the orders' entry in particular cases would have made case-by-case review elusive, if not unobtainable.

After the district court granted the motion to dismiss—and after the government filed this appeal—Appellees promulgated a new version of its Standing Order, superseding the versions that the government challenged. The new version effectively admits that the government was right all along:

3

Appellees followed notice-and-comment procedures before adopting it, thus curing procedural flaws in the original Standing Order. And they revised the substance of the regime in material ways to at least attempt to address the jurisdictional and legal deficiencies that the government identified. For example, the newest version of the Standing Order does not impose injunctive relief; it functions more like an administrative stay; and it requires petitioners to make certain certifications relating to jurisdiction and the equitable factors before it takes effect. Accordingly, the government moved to dismiss this appeal as moot and, because Appellees caused the mootness after they prevailed below, to vacate the district court's opinion under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). But this Court denied the motion and instead set a briefing schedule.

The government continues to believe that Appellees mooted the appeal by rescinding the challenged rules. Yet if the Court disagrees, the pervasive errors in the district court's reasoning warrant reversal on the merits so that the government's challenges may proceed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States and under § 1345 because the United States is a plaintiff. The district court entered a

final order dismissing the case on August 26, 2025, and the government timely filed a notice of appeal on the same day. The government believes that the appeal is now moot; mootness would divest this Court of jurisdiction under Article III. Otherwise, the Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final order disposing of all claims.

## STATEMENT OF THE ISSUES

1.    Whether Appellees mooted this action by materially amending and withdrawing the challenged court rules.

2.    Whether the district court erred by dismissing this lawsuit on threshold grounds.

3.    Whether the challenged court rules were unlawful.

## PERTINENT STATUTES AND RULES

Pertinent authorities are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    Statutory Background

The challenged rules applied to immigration-related habeas petitions filed in district court. As a general matter, Congress has channeled review of challenges to final orders of removal away from district courts, requiring most immigration-related challenges to first proceed before an immigration judge and then be reviewed by the relevant court of appeals.

5

Several statutory provisions accomplish this channeling and foreclose broad remedies in the few matters left to district courts. Most importantly, 8 U.S.C. § 1252(b)(9)—known as the "zipper clause"—channels all review of "any action taken or proceeding brought to remove an alien from the United States" under subchapter II of the Immigration and Nationality Act (INA) into a petition for review of a final order of removal, filed in a court of appeals. It expressly strips district courts of jurisdiction to review final orders of removal, or otherwise review "such questions of law or fact," including "by habeas corpus" or under the All Writs Act. 8 U.S.C. § 1252(b)(9); *see Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

In a separate, complementary provision, 8 U.S.C. § 1252(g), Congress stripped federal courts of jurisdiction to hear "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" under the INA, other than in a petition for review under § 1252, "notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28." 8 U.S.C. § 1252(g). Section 1252(g) thus deprives district courts of jurisdiction over cases challenging the execution of removal orders. *Mapoy v. Carroll*, 185 F.3d 224, 228-29 (4th Cir. 1999).

6

Several independent provisions further restrict federal district courts' authority to intervene in immigration proceedings. In 8 U.S.C. § 1252(f)(1), Congress stripped lower federal courts of "jurisdiction or authority to enjoin or restrain the operation of" many provisions of the INA, including those governing removal proceedings and removal orders, on a classwide basis. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-51 (2022). An order "'enjoin[s] or restrain[s] the operation' of" a covered provision when it "require[s] officials to take actions that (in the Government's view) are not required by [the provision] and to refrain from actions that (again in the Government's view) are allowed by" the provision. *Id.* at 551.

Yet another provision, 8 U.S.C. § 1226(e), bars judicial review of many "discretionary judgment[s]" regarding "the detention of any alien" and prevents the court from "set[ting] aside any action . . . under this section regarding the detention of any alien." And 8 U.S.C. § 1252(e)(2) "limits the review that an alien in expedited removal may obtain via a petition for a writ of habeas corpus" to just three narrow grounds. *DHS v. Thuraissigiam*, 591 U.S. 103, 111 (2020).

## B.    Factual Background

**1.** The United States regulates immigration under its constitutional and statutory authorities, and it enforces federal immigration laws through

the Department of Homeland Security (DHS), including DHS's component agencies U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP). Removal of aliens is handled by ICE. JA56. Within ICE, Enforcement and Removal Operations (ERO) manages the logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the pendency of immigration proceedings. JA56. ERO also manages the physical removal of aliens from the United States pursuant to final orders of removal. JA56.

Detention is an important and necessary part of immigration enforcement. JA56. ICE detains aliens to secure their presence both for immigration proceedings and for their removal, with a special focus on those who represent a risk to public safety or for whom release is prohibited by law. JA56. ERO makes operational determinations regarding custody status based on case-specific factors including the status of removal proceedings, applicable statutory requirements, any prohibitions on release, criminal history, and availability of bed space. JA57.

In Maryland, a state law—the "Dignity Not Detention" Act—restricts Maryland state and local governments' ability to detain aliens in cooperation with ICE. *See* Md. Corr. Servs. Code § 1-102. As a consequence, aliens apprehended in Maryland are generally transported to detention facilities

8

outside Maryland within varying timeframes. JA57. While the ERO Baltimore Field Office may initially have responsibility for managing an apprehended alien's case, once an alien is transferred to a detention facility within the jurisdiction of another ERO Field Office, the receiving office assumes responsibility for managing that alien's case. JA57. An alien may enter and exit ICE custody on more than one occasion from the time he is first encountered until he is either removed from the United States or granted relief or protection from removal. JA57.

**2.** On May 21, 2025, Appellees promulgated Standing Order 2025-01 (the Standing Order). JA61-62. The Standing Order was "ORDERED by" "the U.S. District Court for the District of Maryland," and signed by Chief Judge Russell. JA61-62. It applied to all cases filed on or after 5:00 p.m. on May 20, 2025—the day before it was issued. JA62.

The Standing Order cited the All Writs Act and invoked a "judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action." JA61. It provided that

> upon the filing of a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on behalf of an alien detainee, the Government/Respondents, including all those acting for them or on their behalf, are ENJOINED and RESTRAINED from removing Petitioners in such cases from the continental United States or altering their legal status, provided that Petitioner's full name and A# [*i.e.,* alien number] have been provided to the Court, either in the Petition or in a separate sealed filing.

9

JA61. Furthermore, the Standing Order provided that an order to this effect "shall be entered in every such case upon its filing." JA62. Once entered, that order's "terms" were to "remain in effect until 4:00 p.m. on the second business day following the filing of the Petition," unless extended by the assigned judge. JA62. The Standing Order directed the Clerk to docket the Standing Order in each relevant case and to send a copy of the Standing Order, the habeas petition, and the petitioner's full name and A# to the Civil Division of the District's U.S. Attorney's Office. JA62.

> The Standing Order stated that it was promulgated
>
> in order to preserve existing conditions and the potential jurisdiction of th[e] Court over pending matters while the Court determines the scope of its authority to grant the request[ed] relief; to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief, including participation in court proceedings and access to legal counsel for such purpose; to ensure the Court is able to evaluate their respective claims for relief based on their in-court testimony that may be offered; and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense."

JA61.

On May 28, 2025, Appellees promulgated Amended Standing Order 2025-01. JA64-65. Like the Standing Order, the Amended Standing Order was "ORDERED by" Defendant "the U.S. District Court for the District of Maryland," and signed by Chief Judge Russell. JA65. The Amended Standing Order did not specify to which cases it applied.

10

The Amended Standing Order, like the Standing Order, purported to invoke the All Writs Act and a "limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action." JA64. It provided that, after the filing of "(1) a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on behalf of an alien detainee located in the District of Maryland, and (2) the Petitioner's full name and A#," the Clerk shall "docket this Order in the case and simultaneously send a copy of this Order, the Petition, and the Petitioner's full name and A# to the Chief and Deputy Chief of the Civil Division of the United States Attorney's Office for the District of Maryland, and then file a Notice that the documents have been transmitted." JA65. The Amended Standing Order then provided that, "effective upon the filing of the Notice," "Government/Respondents, including all those acting for them or on their behalf, are ENJOINED and RESTRAINED from removing Petitioners from the continental United States or altering their legal status." JA65.

The Amended Standing Order, like the Standing Order, provided that it "shall remain in effect until 4:00 p.m. on the second business day [following] the filing of the [Petition]," unless extended by the judge assigned to the case. JA65. It also provided that "Government/Respondents shall notify appropriate officials of this Order promptly and provide all necessary

11

information and documents to effectuate compliance with this Order." JA65.

Like the original Standing Order, the Amended Standing Order stated that it

was promulgated

> in order to preserve existing conditions and the potential jurisdiction of th[e] Court over pending matters while the Court determines the scope of its authority to grant the requested relief; to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief, including participation in court proceedings and access to legal counsel for such purpose; to ensure the Court is able to evaluate their respective claims for relief based on their in-court testimony that may be offered; and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense.

JA65. The Amended Standing Order additionally stated that "[t]he recent

influx of habeas petitions concerning alien detainees purportedly subject to

improper and imminent removal from the United States that have been filed

after normal court hours and on weekends and holidays has created

scheduling difficulties and resulted in hurried and frustrating hearings in

that obtaining clear and concrete information about the location and status

of the petitioners is elusive." JA64.

**3.** Implementation of these Standing Orders interfered with ICE's

mission to administer and enforce the immigration laws, protect public

safety, and promote national security. The Standing Orders threatened to

adversely impact the operational planning necessary to coordinate a

removal, especially a removal to a country that may be recalcitrant about

12

accepting the alien. JA58. Removals can take months of sensitive diplomacy to arrange and often do not completely come together until the last minute. A delay can undo all of those arrangements and require months of additional work before removal can be attempted again. Aliens also often have travel documents with expiration dates. A judicially imposed delay can halt removals until after those travel documents have expired and removal is thus no longer possible without securing new travel documents.

In addition to restricting movement of covered aliens, the Standing Orders precluded the government from "altering [the alien's] legal status." JA61; JA64. The Standing Orders thus barred ICE from implementing final orders of removal by removing the alien. The Standing Orders even barred immigration judges from taking action in the alien's immigration proceedings, including by entering a removal order or adjudicating any applications for relief, such as asylum, withholding of removal, protection under the Convention Against Torture, and voluntary departure. *See* JA58. And the Standing Orders may even have barred courts of appeals from acting on a pending petition for review, which could constitute changing the alien's legal status. They likewise precluded DHS from implementing an order resolving a petition for review.

13

The Standing Orders also impeded ICE's work by creating bad litigation incentives. As noted above, the lack of bed space in Maryland means that ERO must often transport aliens apprehended in Maryland to detention facilities elsewhere. JA57. But the Standing Orders did not afford any pre-injunction opportunity to contest the alien's assertion of being "located in the District of Maryland" at the time of a habeas filing. JA65. Consequently, the Standing Orders incentivized aliens to allege they were in Maryland, and invited opportunistic litigators to file "on behalf of" of an alien, even though the filer may not know the alien's location at the time of filing.

The Standing Orders were entered in multiple cases.[1] Remarkably, Appellees entered the Amended Standing Order in a case in which the petitioner had undisputedly already arrived at a detention facility in Texas the day *before* his lawyer filed a habeas petition alleging that he was detained in Maryland. *Hernandez Escalante v. Noem*, No. 25-1799 (D. Md.). Despite

---

[1] *See, e.g.*, *Bonilla Martinez v. Baker*, No. 25-2027 (D. Md.), ECF No. 2; *Talebinejad v. Baker*, No. 25-2024 (D. Md.), ECF No. 3; *Quintana Flores v. Bondi*, No. 25-1950 (D. Md.), ECF No. 2; *Cruz-Medina v. Noem*, No. 25-1768 (D. Md.), ECF No. 2; *Cordon-Salguero v. Noem*, No. 25-1626 (D. Md.), ECF No. 2; *Melgar Hernandez v. Baker*, No. 25-1663 (D. Md.), ECF No. 8; *Ramos v. Noem*, 25-1673 (D. Md.), ECF Nos. 3, 5; *Portela-Hernandez v. Trump*, No. 25-1633 (D. Md.), ECF Nos. 5, 10; *Umanzor Chavez v. Noem*, No. 25-1634 (D. Md.), ECF Nos. 2, 6; *Ghamelian v. Baker*, No. 25-2106 (D. Md.), ECF No. 2; *Zavvar v. Scott*, No. 25-2104 (D. Md.), ECF No. 3.

this undisputed fact, which defeated jurisdiction, the Court entered and even extended the Amended Standing Order. *Id.*, ECF Nos. 4, 9, 11.

### C.   Procedural Background

**1.** On June 24, 2025, the United States and DHS filed a complaint in the District of Maryland seeking injunctive relief against implementation of the Standing Orders and a declaratory judgment that the Standing Orders were invalid. The complaint named as defendants the court itself, its active judges, and its clerk. JA5-8. The complaint raised three claims. Count One alleged that the Standing Orders violated federal law by bypassing mandatory substantive and procedural prerequisites for preliminary equitable relief. JA15-18. Count Two alleged that the Standing Orders violated several jurisdictional bars and limitations on judicial review in the Immigration and Nationality Act. JA18-19. Count Three alleged that the Standing Orders functioned as local rules and were invalid because they did not go through the notice-and-comment rulemaking procedure required by statute for such rules. JA20. At the same time it filed the complaint, the government moved to recuse all of the active judges and asked for the case to be transferred to a judge from another district. JA23.

This Court assigned the case to Judge Thomas Cullen of the Western District of Virginia. The government then filed a motion for a preliminary

injunction. JA28. Appellees opposed the preliminary-injunction motion and moved to dismiss. *See* JA69.

**2.** On August 26, 2025, Judge Cullen dismissed the suit on threshold grounds. Judge Cullen concluded that the government lacked standing to pursue its claim for injunctive relief. JA183-187. He also held that the court had sovereign immunity and that the judges and clerk retain judicial immunity for official acts like promulgating and entering standing orders. JA187-198. Last, he concluded that the government lacked a cause of action to sue a coordinate branch. JA198-208. The government appealed on that same day. JA213.

**3.** On September 12, 2025, the District of Maryland released a proposed Second Amended Standing Order 2025-01, which would supersede the prior iteration, for notice and comment.[2]

DHS submitted a comment opposing the rule. On December 1, 2025— after the comment period closed—the District of Maryland adopted the

---

[2] United States District Court for the District of Maryland, *Proposed Second Amended Standing Order 2025-01 (with edits shown)*, https://www.mdd.uscourts.gov/sites/mdd/files/Redline-SecondAmendedStanding Order%202025-1.pdf (accessed March 30, 2026); *see also* United States District Court for the District of Maryland, *Proposed Amendments to the Local Rules* 2, https://www.mdd.uscourts.gov/sites/mdd/files/LocalRules NoticePublic2025Supp.pdf (accessed March 30, 2026) (soliciting comments by November 12, 2025, on "proposed Second Amended Standing Order 2025-01").

Second Amended Standing Order.[3] The new Order supersedes the two Orders challenged in this lawsuit. The District of Maryland's website no longer lists the two previous Orders under "Standing Orders."[4]

Unlike the previous Orders, the Second Amended Standing Order states that it shall be entered only when requested and only after the habeas petitioner certifies that he or she is detained in Maryland, that the District of Maryland has jurisdiction, and that "emergency relief is necessary." Second Amended Standing Order at 2. It provides for shortening or extending the effective period if necessary to give the presiding judge time "to make an intelligent decision" on the request for emergency relief. *Id.* It also provides for dissolution "upon good cause shown by the Government/Respondents." *Id.* at 3. And it purports to function as an administrative stay of removal, rather than an injunction. *Id.* at 2-3.

**4.** On January 16, 2026, the government filed a motion to dismiss this appeal on mootness grounds and to vacate the district court's decision under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). Doc. 19-1.

---

[3] United States District Court for the District of Maryland, *Second Amended Standing Order 2025-01*, https://www.mdd.uscourts.gov/sites/mdd/files/Second%20Amended%202025-01.pdf (accessed March 30, 2026).

[4] United States District Court for the District of Maryland, *Standing Orders*, https://www.mdd.uscourts.gov/standing-orders (accessed March 30, 2026).

17

The government argued that the issuance of the Second Amended Standing Order mooted the appeal because the government's lawsuit sought solely prospective relief against the first two versions of the Standing Order, which are no longer in effect. *Id.* at 9. The government also argued that vacatur was appropriate under *Munsingwear* because the appeal became moot through the actions of the parties that prevailed in the district court, and the public interest favored vacatur, including because it "promotes the 'orderly operation of the federal judicial system.'" *Id.* at 11 (quoting *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 327 (4th Cir. 2021)).  Appellees opposed the motion. Doc. 22.

On February 10, the Court denied the government's motion. It stated that "[t]he case is not moot." Doc. 24 at 2.

## SUMMARY OF ARGUMENT

I. This case is moot. The government sued to challenge Standing Orders that have now been rescinded. Because the government sought solely prospective relief, and there is no indication that Appellees will return to either of these Standing Orders in the future, the government respectfully maintains that this case is appropriate for *Munsingwear* vacatur. *See* Doc. 19-1.

18

The motions panel denied the motion to dismiss because it concluded that "[t]he case is not moot." Doc. 24 at 2. But neither of the two decisions cited in that order supports the conclusion that the Court can grant effectual relief in this case now. Appellees' latest Standing Order "significantly alter[ed] the posture of the case." *Brusznicki v. Prince George's Cnty.*, 42 F.4th 413, 419 (4th Cir. 2022). It purports to issue a different kind of relief in different circumstances, and it was adopted after notice and an opportunity for comment. With no prospect that granting relief could be appropriate based on the underlying merits, the parties' disagreement over the threshold issues are reduced to abstract questions of law. Respectfully, the government renews its request to dismiss the appeal as moot and vacate the district court's judgment.

II. To the extent the Court concludes the appeal is not moot, it should reverse. The district court's threshold dismissal lacks merit because the proper way to challenge a categorical court rule is through a lawsuit like this one. *See, e.g.*, *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 11 (1st Cir. 2000); *Russell v. Hug*, 275 F.3d 812, 816-23 (9th Cir. 2002). Courts have thus repeatedly entertained similar lawsuits. The district court nonetheless found this lawsuit improper on three grounds that the government contests here.

19

A. First, the district court erred in rejecting the government's *Debs* cause of action. Courts have long recognized that the United States has an equitable cause of action permitting it to file suit, represented by the Executive Branch, to protect the federal government's interests. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967); *In re Debs*, 158 U.S. 564, 582 (1895). For that reason, the Supreme Court has repeatedly adjudicated cases where the United States sought injunctions to protect its sovereign interests. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). Here, the United States has a sovereign interest in its ability to uniformly and expeditiously enforce the nation's duly enacted immigration laws. It may sue in equity to vindicate that interest.

The district court recognized the deep roots of this cause of action, but it mistakenly concluded that "the Executive" cannot "sue a co-equal branch of government." JA201. But in this lawsuit, like other lawsuits invoking this cause of action, the Executive Branch is not the party filing suit. The United States is the party filing suit, and the Executive Branch merely represents the United States in litigation because such representation is an executive function. Once that is clarified, it makes no difference that the party on the other "side[] of the 'v.,'" JA133, is part of the federal government. First, suits on behalf of the United States against another part of the federal government

20

are not novel. *See, e.g., United States v. Interstate Commerce Comm'n*, 337 U.S. 426 (1946). Second, the district court's concern that such actions "would give the Executive unconstitutional leverage over its equal branches of government" was misplaced because a cause of action merely permits the *filing* of a lawsuit seeking redress. Indeed, it is the order below that would give federal district courts unlawful leverage against litigants, by enabling them to issue illegal orders effectively insulated from review.

B. Second, the district court declined to follow the Supreme Court's explicit holding that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam*, 466 U.S. at 541-42. In *Pulliam*, as here, "the plaintiff sought an injunction only to prevent the judge from enforcing a rule of her own creation." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 42 (2021). Judicial immunity does not apply in that situation. Indeed, a suit over a court's rulemaking does not implicate the concerns underlying immunity doctrine. Judicial immunity "is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988). Unlike issuing rulings in particular cases, promulgating general standing orders and rules like those challenged here is not a "function[]" traditionally protected by judicial immunity.

21

The district court's contrary conclusion depended not only on over-reading precedents about judicial immunity but also on under-reading *Pulliam.* It determined that *Pulliam*'s clearly stated and broad rule is limited to suits against *state* judges. JA190. By the Supreme Court's own terms, however, its analysis was not limited to state courts. The district court's divergent determination relied on a faulty analogy between state courts and "inferior courts" in the English common-law system. JA191. Specifically, the district court concluded based on *Pulliam*'s discussion of common-law history that one federal court should not be able to enjoin another, even if a federal court can enjoin a state court. JA192-193. But that conclusion does not square with *Pulliam*, which not only rejected a comparison between the English King's Bench and federal district courts but also held that the historical "limitation on the use of the injunction" against judges "says nothing about the scope of judicial immunity." 466 U.S. at 529. Instead, "in the view of the common law, there was no inconsistency between a principle of immunity that protected judicial authority from 'a wide, wasting, and harassing persecution' and the availability of collateral injunctive relief in exceptional cases." *Id.* at 536.

Beyond *Pulliam*, Supreme Court caselaw on abstention and official immunity doctrines undermines the distinction the district court drew

22

between state and federal judges for immunity purposes. States are also sovereigns under the Constitution, and, far from exercising "significant collateral control over" state courts, JA191, federal courts are strictly constrained by a number of abstention doctrines and bars on collateral intervention that limit their ability to interfere in state-court decisionmaking. The Supreme Court's thorough discussion of principles governing state- and federal-officer immunity in *Butz v. Economou*, 438 U.S. 478 (1978), also contradicts the district court's ruling here. As the Court there held, "[t]here is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state officials when sued for the identical violation under § 1983." *Id.* at 500. The district court gave no convincing explanation of why judicial immunity should be any different—especially in light of *Pulliam*'s explicit and categorical rule.

C. Third, the district court held that the government lacked standing to seek injunctive relief against the judges and clerk. But that holding was predicated on the district court's incorrect conclusion that judicial immunity makes injunctive relief unavailable against federal judges (a conclusion inconsistent with *Pulliam*). The district court also incorrectly classified a merits issue—whether the government may obtain particular relief at the end

23

of the lawsuit—as a redressability issue. Redressability instead concerns whether the relief requested, if granted, would redress the plaintiff's injury. The Supreme Court has warned against such misclassification. *See Davis v. United States*, 564 U.S. 229, 249 n.10 (2011).

D. The problems with the district court's threshold rulings become more apparent given the government's lack of other adequate options to challenge the Standing Orders. Although the district court dismissed this concern, suggesting that individual-case appeals, mandamus, or petitioning the Judicial Council were alternative routes available to the government, each of those routes poses problems not present in a facial lawsuit. For example, appeals would face potential justiciability hurdles including mootness (if the Standing Orders expired in a particular case). The consequences of the district court's reasoning also raise significant quandaries. For example, neither individual-case appeals nor mandamus would be available if a district court issued an arguably illegal rule preventing the filing and docketing of certain cases. More fundamentally, that alternative avenues might exist does not negate the government's right to bring a facial lawsuit when one is appropriate. Doing so here was the most efficient and effective way for the government to seek vindication of its undisputed interest in enforcing federal immigration law.

III. The Standing Orders were substantively unlawful for three reasons. First, they mandated issuance of equitable relief without complying with the requirements for issuing such relief. Federal Rule of Civil Procedure 65 places strict limits on district courts' power to preliminarily enjoin any litigant. Those limits include requiring the movant to show he or she is likely to succeed on the merits and that irreparable harm will result absent preliminary relief. But the Standing Orders required neither of those showings. They also violated other procedural requirements by effectively requiring the automatic issuance of an injunction against the entire federal government upon the mere filing of a habeas petition by an alien purporting to be in the District of Maryland.

Second, the Standing Orders ignored legislative limits on district courts' authority in immigration matters. Congress has expressly stripped district courts of authority to enjoin the operation of the immigration laws in all but limited circumstances not present here. Yet the Standing Orders purported to require automatic preliminary relief with no finding that jurisdiction was present.

Third, the Standing Orders were promulgated without required notice and opportunity for comment. By both statute and rule, federal district courts are required to satisfy certain procedural requirements before

25

promulgating local rules. The Standing Orders functioned as local rules, but Appellees did not check those required procedural boxes. Indeed, the District of Maryland tacitly acknowledged this problem when it issued the Second Amended Standing Order after a notice-and-comment period.

## STANDARD OF REVIEW

The district court's grant of the motion to dismiss is reviewed de novo. *Talley v. Folwell*, 133 F.4th 289, 297 n.3 (4th Cir. 2025).

## ARGUMENT

## I. The District of Maryland Mooted This Prospective Challenge to the Standing Orders by Materially Amending and Withdrawing Them.

This case is moot. The government sued to challenge the Amended Standing Order and, to the extent it continued to have any prospective effect, the original Standing Order. But those orders are no longer in effect; the government sought solely prospective relief; and there is no indication that Appellees will return to either of these Standing Orders in the future. The government thus respectfully maintains that the case became moot when Appellees rescinded the challenged standing orders after prevailing in the district court, and this appeal presents a core case for *Munsingwear* vacatur. *See* Doc. 19-1.

The motions panel denied the government's motion to dismiss because it concluded that "[t]he case is not moot," citing two decisions. Doc. 24 at 2.

26

But neither supports the conclusion that the Court can possibly grant any effectual relief in this case now that the challenged standing orders have been rescinded and lack any prospective effect. The first decision, *New York State Rifle & Pistol Ass'n v. City of New York*, acknowledged that an amendment that gave the petitioners "the precise relief that petitioners requested in the prayer for relief in their complaint" mooted the petitioners' prospective claims for relief from the old rule, even if the new rule "may still infringe their rights" in ways that were "understandably not asserted previously." 590 U.S. 336, 338-39 (2020). That is the situation here, which cuts in favor of mootness: The government received complete relief from the orders it challenged when Appellees voluntarily rescinded them. The mere possibility that the government could have "some residual claim under" the distinct new Standing Order, which purports to issue a different kind of relief in different circumstances, does not prevent mootness here any more than in *New York State Rifle & Pistol. Id.* at 339.

Likewise, the second decision the motions panel cited acknowledged that "a legislative amendment will moot a challenge only when it 'significantly alters the posture of the case.'" *Brusznicki*, 42 F.4th at 419. There, an amendment fixed alleged problems with one category of properties but left another unchanged, which mooted the challenge as to the first

category but left it live as to the second. *Id.* Here, Appellees' latest Standing Order "significantly alter[ed] the posture of the case." *Id.* It purports to issue a different kind of relief (a stay, not an order enjoining and restraining the government, calculated to moot the government's first merits argument, *see infra* pp. 52-55) in different circumstances (only when requested and upon certifications of physical location and district-court jurisdiction, calculated to moot the government's second merits argument, *see infra* pp. 55-58), and it was adopted after notice and opportunity for comment (calculated to moot the government's third merits argument, *see infra* pp. 58-59). Those amount to precisely the significant alterations to the posture of the case that render it moot under the very cases the panel cited to conclude that it was not moot.

With no prospect that granting relief could be appropriate based on the underlying merits, the parties' disagreement over the threshold issues on which the district court ruled are reduced to abstract questions of law. Respectfully, the government renews its request to dismiss the appeal as moot. *See Castendet-Lewis v. Sessions*, 855 F.3d 253, 259 (4th Cir. 2017) ("We again assess the Attorney General's jurisdictional contention, [] because the law of the case doctrine does not bar us 'from revisiting a prior ruling of a motion panel on the Court's jurisdiction.'" (citation omitted)).

28

Because the appeal became moot through the actions of the parties that prevailed below, the government also respectfully renews its request for vacatur of the district court's opinion and judgment under *Munsingwear*. Vacatur in these circumstances is a core application of *Munsingwear*. *See U.S. Bancorp Mort'g Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994) (explaining that vacatur is appropriate "when mootness results from unilateral action of the party who prevailed below"). The "twin considerations of fault and public interest" both favor vacatur. *See Hirschfeld*, 14 F.4th at 327. The government is not at fault for the appeal's mootness because Appellees acted unilaterally to supersede the Standing Orders. And the public interest favors vacatur: as a general matter, *Munsingwear* vacatur "promotes the 'orderly operation of the federal judicial system.'" *Hirschfeld*, 14 F.4th at 327 (quoting *U.S. Bancorp*, 513 U.S. at 27). More specifically, the public interest is "no bar to vacatur" here, where the challenged Orders "no longer exist"; the District of Maryland's new standing order "ha[s] been substantially revised"; and "there is no suggestion of" the previous Orders' "likely reenactment." *See Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 121 (4th Cir. 2000).

29

## II.     The District Court Erred by Rejecting This Procedurally Proper Facial Challenge to a Court Rule.

To the extent the Court concludes the appeal is not moot, it should reverse the district court's threshold dismissal. The proper way to pursue a legal objection to a categorical court rule is through a challenge like this one. None of the district court's jurisdictional or other threshold concerns has merit.

"[T]he proper method for mounting a facial challenge to the validity of [a local rule] … is through an action for declaratory and/or injunctive relief filed in the district court." *Stern*, 214 F.3d at 11 (second and third alterations in original) (quoting *Sheldon Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*, 53 F.3d 1349, 1353 (1st Cir. 1995)). The same is true for facial challenges to standing orders. *See, e.g.*, *Russell*, 275 F.3d at 816-23 (lawsuit against district court judges to challenge validity of court's "general order"). Courts have thus repeatedly entertained similar lawsuits, filed by both government and private plaintiffs, challenging the enforcement of local rules and orders by naming the court, clerks, and judges as defendants.[5] That mechanism is

---

[5] *See, e.g.*, *Stern*, 214 F.3d at 9-10 (U.S. Attorney and DOJ official challenging local rule by suing district court); *Sheldon Whitehouse*, 53 F.3d at 1353-54 (U.S. Attorney challenging local rule by suing district court); *Carter v. Clark*, 616 F.2d 228, 231 (5th Cir. 1980) (class of plaintiffs challenging local rule by suing clerk); *Thaw v. Lynch*, 2016 WL 1045527, at *1 (D. Ariz. Mar. 16, 2016) (plaintiffs challenging local rule by suing district

*Continued on next page.*

entirely appropriate: It proceeds against the defendant that promulgated the unlawful order and seeks judicial resolution of an actively disputed legal question about the validity of the rule. The action invokes a long-recognized nonstatutory cause of action that permits the United States to sue to protect the federal government's interests. And judicial immunity does not shield courts or judges from lawsuits challenging judicial rules and seeking prospective relief. The district court erred in holding otherwise and rejecting this challenge on threshold grounds.

### A. The United States has an equitable cause of action to enjoin an unlawful court rule.

**1.** Courts have long recognized that the United States has an equitable cause of action permitting it to sue, represented by the Executive Branch, when necessary to protect the federal government's interests. Indeed, the "general rule" is that "the United States may sue," through the Executive Branch, "to protect its interests." *Wyandotte*, 389 U.S. at 201. That rule dates back to *Debs*, where the Supreme Court held that the United States may obtain an injunction to "enforce in any part of the land the full and free exercise of all national powers." 158 U.S. at 582. Although *Debs* drew from

---

judges); *Nat'l Ass'n for the Advancement of Multijurisdiction Prac.* [NAAMJP] *v. Roberts*, 180 F. Supp. 3d 46, 55-56 (D.D.C. 2015) (same); *NAAMJP v. Holder*, No. 1:14-CV-2110, 2015 WL 13158479, at *3-4 (D. Md. Aug. 18, 2015) (same).

public-nuisance cases, *id.* at 592-93, its holding was broader: "whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are [e]ntrusted to the care of the [N]ation, and concerning which the [N]ation owes the duty to all the citizens of securing to them their common rights," then the Executive Branch may sue on behalf of the United States for equitable relief without an express statutory cause of action, *id.* at 586.

The Supreme Court has time and again adjudicated cases in which the United States sought injunctions to protect its sovereign interests. *See, e.g.*, *Arizona*, 567 U.S. 387 (preemption of state immigration law); *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405 (1925) (fulfillment of treaty obligations); *Heckman v. United States*, 224 U.S. 413 (1912) (protection of tribes); *United States v. Texas*, 143 U.S. 621 (1892) (dispute over boundary); *United States v. Am. Bell Tel. Co.*, 128 U.S. 315 (1888) (invalidation of patent); *United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888) (invalidation of land grant); *United States v. City of Jackson*, 318 F.2d 1, 15 (5th Cir. 1963) (protection of interstate commerce). Here, the United States has a sovereign interest in its ability to uniformly and expeditiously enforce the nation's duly enacted immigration laws. It may sue in equity to vindicate that interest.

32

**2.** The district court recognized the deep roots of this cause of action, but it mistakenly framed the lawsuit as an inter-branch action, labeling the plaintiffs "the Executive" and concluding that "the Executive" cannot "sue a co-equal branch of government." JA200-201. But this lawsuit, like others invoking this cause of action, was filed by the United States as plaintiff. The Executive Branch merely represents the United States in litigation because such representation is an executive function. *See Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976) (per curiam).

It makes no difference that the party on the other "side[] of the 'v.,'" JA133, is part of the federal government. That is immaterial both formally and functionally.

Formally, suits on behalf of the United States against another part of the federal government are not novel. *See, e.g.*, *United States v. United States*, 417 F. Supp. 851 (D.D.C. 1976), *aff'd sub nom. Nat'l Classification Cmte. v. United States*, 430 U.S. 961 (1977); *Interstate Commerce Comm'n*, 337 U.S. 426; *see also United States v. Fed. Maritime Comm'n*, 694 F.2d 793, 810 (D.C. Cir. 1982) (rejecting argument that there was no controversy "between the United States as sovereign and an agency of the United States"). Indeed, mandamus actions filed by the United States have often named a district court or judge as the respondent. *See, e.g.*, *In re United States*, 194

33

U.S. 194, 194 (1904) (petition for writ of mandamus against district judge); *United States v. U.S. Dist. Ct. (In re United States)*, 791 F.3d 945, 951 (9th Cir. 2015) (same against district court); *United States v. Hall*, 145 F.2d 781, 782 (9th Cir. 1944) (same against district judge); *United States v. Severens*, 71 F. 768, 769 (6th Cir. 1896) (same). Moreover, if a federal district court were suffering unlawful injury at the hands of an independent agency or legislative staffers, the United States, represented by the Executive Branch, could sue to prevent that injury to the government's interests. The analysis is no different because the district court is the entity *causing* the injury.

Functionally, the district court's concern that such actions "would give the Executive unconstitutional leverage over its equal branches of government" was misplaced, as the district court's own order illustrates. JA201. A cause of action merely permits the filing of a lawsuit, calling upon the judiciary to perform its constitutional function by adjudicating that case. The judiciary would hardly be debased or disempowered by hearing such a case. Indeed, it is the district court's decision that would give federal district courts unlawful leverage against litigants. Under the decision below, district courts could issue illegal orders that are effectively insulated from judicial review. That state of affairs makes no sense, and this Court should correct it.

34

## B.     Judicial immunity does not bar the claims against the judges and clerk.

**1.** "[J]udicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam*, 466 U.S. at 541-42. In *Pulliam*, as here, "the plaintiff sought an injunction only to prevent the judge from enforcing a rule of her own creation." *Jackson*, 595 U.S. at 42. Judicial immunity does not apply in such cases.[6]

The nature of the challenged action—rulemaking—does not implicate the concerns underlying immunity doctrine. As the Supreme Court has explained, a "'functional' approach" applies "to immunity questions other than those that have been decided by express constitutional or statutory enactment." *Forrester*, 484 U.S. at 224. Under this approach, judicial immunity "is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Id.* at 227. Unlike issuing rulings in particular cases, promulgating district-wide standing orders and local rules that violate procedural and substantive requirements is not a "function[]" traditionally protected by judicial immunity. Thus, courts have often ruled

---

[6] The government is not appealing the district court's *sovereign* immunity holding. That holding applied only to the District of Maryland as an entity—not the judges or clerk. JA188. By itself, it does not dispose of the lawsuit. The government also notes that the district court's judicial-immunity holding applied to the request for declaratory as well as injunctive relief. JA187. The arguments in this section also apply to both.

on challenges to local rules with nary a peep about judicial immunity. *See supra* n.5 (collecting cases).

Here as in those cases, because the challenged act is a district-wide local rule, there is no need to invoke caselaw addressing whether judicial immunity is overcome when a judge in an individual case acts "in the 'clear absence of all jurisdiction over the subject-matter.'" *Gibson v. Goldston*, 85 F.4th 218, 223 (4th Cir. 2023). The district court mistakenly assumed that this line of precedent applied, without accounting for the type of action challenged here. JA189. Other appellate decisions that the district court cited to support its immunity holding are similarly inapposite. In *Bolin v. Story*, 225 F.3d 1234 (11th Cir. 2000), and *Mullis v. U.S. Bankruptcy Court for District of Nevada*, 828 F.2d 1385 (9th Cir. 1987), the relief sought pertained to the defendant judges' adjudicatory decisions in particular cases. *See* JA194-195 (discussing these cases). The same is true of *Stephens v. Herring*, 827 F. Supp. 359, 364 (E.D. Va. 1993), a decision the district court cited for its discussion of English common law. JA192-195. Nobody disputes that judicial immunity applies in such cases.

But *Pulliam* was different—and this case is different—because the government "sought an injunction only to prevent the judge[s] from enforcing a rule of [their] own creation" and to prevent the clerk from

implementing it. *Jackson*, 595 U.S. at 42. Under *Pulliam*, that issuing a general order or rule may be a "judicial act," JA197, does not make the issuer immune. *See Jackson*, 595 U.S. at 42. Yet the district court did not engage with this aspect of *Pulliam* or *Jackson*'s more recent gloss. That was error.

**2.** The district court acknowledged *Pulliam*'s holding but read it far too narrowly. It determined that, "[d]espite the admittedly sweeping nature" of the Supreme Court's holding regarding the unavailability of judicial immunity as a "bar to prospective injunctive relief against a judicial officer acting in her judicial capacity," that rule is limited to suits against *state* judges. JA190 (quoting *Pulliam*, 466 U.S. at 541-42). That reading of *Pulliam* is wrong.

As an initial matter, the district court's reading gives short shrift to *Pulliam*'s sweeping terms: "We have never had a rule of absolute judicial immunity from prospective relief." 466 U.S. at 536 (also describing "the common law's rejection of a rule of judicial immunity from prospective relief"). By the Supreme Court's own terms, its analysis of the common-law history was not limited to that history's applicability to state judges: the Court first stated that "there is little support in the common law for a rule of judicial immunity that prevents injunctive relief against *a* judge" before noting that "[t]here is even less support for a conclusion that Congress

37

intended to limit the injunctive relief available under § 1983 in a way that would prevent federal injunctive relief against a *state* judge." *Id.* at 540 (emphases added).

Beyond watering down *Pulliam*'s express holding, the district court's analysis also relied on a faulty analogy between state courts and "inferior courts" in the English common-law system. JA191. For support, the district court quoted the Supreme Court's statement that a "common-law parallel to the § 1983 injunction at issue" in *Pulliam* was "the King's prerogative writs" to inferior courts. JA191 (quoting *Pulliam*, 466 U.S. at 529). From there, the district court reasoned that judicial immunity, from starting out as a protection afforded "only to the higher judges of the King's courts," was "extended to other inferior courts … only to an extent," because "[t]he King's Bench exercised significant collateral control over" them, while "the sovereign courts' judges themselves were immune from collateral review by other courts." JA191-192 (quoting *Pulliam*, 466 U.S. at 531-32). And the district court concluded that one federal court should likewise not be able to enjoin another. JA192-193.

The district court's analysis is inconsistent both with *Pulliam* and with other Supreme Court caselaw addressing immunity questions in the state and federal systems. In reasoning acknowledged but not followed by the

38

district court, *Pulliam* discredited a comparison between the King's Bench and federal district courts. *See* 466 U.S. at 535 ("The relationship between the King's Bench and its collateral and inferior courts is not precisely paralleled in our system by the relationship between the state and federal courts."). Moreover, the Supreme Court's evaluation of the history in *Pulliam* did not depend on its framing of the § 1983 injunctive remedy as a parallel to the "King's prerogative writs." JA186. Indeed, if descriptions of English remedies were significant to the holding, then *Pulliam*'s historical analysis would arguably be better read as distinguishing between common-law and non-common-law remedies than between state and federal courts. The Court noted that while, "[a]t the common law itself, there was no such thing as an injunction against a judge," injunctions were "an equitable remedy that could be awarded by the Chancellor only against the parties in proceedings before other courts." 466 U.S. at 529. Critically, however, "[t]his limitation on the use of the injunction ... says nothing about the scope of judicial immunity." *Id.*

What is more, if the state-federal relationship were akin to that between "inferior" common-law courts and the King's Bench, JA191-192, that would create tension with long-settled principles governing the federal system of dual sovereigns. Far from exercising "significant collateral control

39

over" state courts, JA191, federal courts are strictly constrained by a number of doctrines that limit their ability to alter state-court rulings or even decide issues pending simultaneously in state courts. *See, e.g.*, *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941); *Rooker v. Fidelity Tr.*, 263 U.S. 413 (1923). These doctrines align with the reality that States too are sovereign under our Constitution. If the rule were that injunctive relief was not available against "the sovereign," JA192, then the *Pulliam* Court would have had more explaining to do about why such relief was available against *separate* sovereigns. *Cf. Gamble v. United States*, 587 U.S. 678, 687 (2019) (describing "the foundation laid in our antebellum cases: that a crime against two sovereigns constitutes two offenses because each sovereign has an interest to vindicate").

Even apart from *Pulliam* and abstention doctrines, the district court's conclusion that federal judges merit more immunity than state judges is inconsistent with the Supreme Court's caselaw. As the Court stated in *Butz v. Economou*, 438 U.S. 478, 500 (1978), "[t]here is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state

40

officials when sued for the identical violation under § 1983." The *Butz* Court noted that, "with impressive unanimity, the Federal Courts of Appeals have concluded that federal officials should receive no greater degree of protection from *constitutional* claims than their counterparts in state government." *Id.* at 498. And it "agree[d] . . . that, in the absence of congressional direction to the contrary, there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement." *Id.* at 500. After all, "[t]he pressures and uncertainties facing decisionmakers in state government are little if at all different from those affecting federal officials." *Id.* Although *Butz* addressed a different context, its reasoning applies to state and federal judges—especially because *Pulliam* addressed the immunity issue in sweeping terms applicable to both. Moreover, as in *Butz,* here no "congressional direction to the contrary" exists. *See id.* at 500, 504.

Even if the analogy between the King's Bench and federal district courts were apt, it would not support the district court's holding.[7] *Pulliam* rejected the conclusion that the King's Bench could not be enjoined *because*

---

[7] Setting aside *Pulliam* and the constitutional reality that states are separate sovereigns, it would still not be clear that the King's Bench analogy works. Federal appellate courts would likely be a closer comparator than federal district courts.

*of* judicial immunity. *Id.* at 536; *see* JA192 (acknowledging that the "insulation" of the King's Bench from "collateral injunctive relief" "had less to do with the doctrine of judicial immunity than with the fact that only the superior judges of the King's Bench . . . had authority to issue the prerogative writs" (brackets removed) (quoting *Pulliam*, 466 U.S. at 536)). Instead, "in the view of the common law, there was no inconsistency between a principle of immunity that protected judicial authority from 'a wide, wasting, and harassing persecution' and the availability of collateral injunctive relief in exceptional cases." *Pulliam*, 466 U.S. at 536.

**3.** It bears emphasis that failing to follow *Pulliam*'s holding according to its clear and broad terms would have absurd consequences. For example, it would mean that if a district court adopted a standing order imposing an allegedly unlawful prerequisite for filing certain lawsuits, potential plaintiffs could not challenge that prerequisite by appeal because their lawsuits would not be docketed in the first place. Mandamus challenges in such cases would also be all but precluded: the writ would be available only if the unlawfulness of the prerequisite were "clear and indisputable." *See In re Musk*, --- F.4th ---, 2026 WL 626965, at *2 (4th Cir. Mar. 4, 2026). If, however, the interpretation of the filing prerequisite were in question, mandamus would almost certainly be denied. Yet under the district court's judicial-immunity

42

holding, such would-be movants could not seek adjudication of the filing prerequisite's validity in a facial lawsuit. In short, applying artificial limitations to *Pulliam*'s clear and broadly stated holding that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity" would make no practical sense. 466 U.S. at 541-42.

In sum, judicial immunity does not protect the judges and clerk for their roles in issuing and implementing the Standing Orders.

### C. The government has standing to seek injunctive relief.

The district court dismissed the government's request for injunctive relief because it found that the government lacked standing to pursue that relief. JA183-187. Although the district court indicated that it agreed the government was injured and that the injury was caused by the Standing Orders, and it did not dispute that the requested injunction would remedy the injury, the court nevertheless concluded that redressability was lacking because it lacked authority to enjoin Appellees. JA184-185. That reasoning suffers from two serious flaws.

First, the court's understanding of history and the traditional limits of equity was wrong, as described above. *Pulliam* did not hold or imply that injunctive relief is categorically unavailable against federal judges. Because

43

the district court's reading of *Pulliam* was incorrect, the predicate for its standing analysis falls away.

Second, the availability of a particular form of relief is not a standing issue. Likely for that reason, Appellees did not raise it as a standing issue. The district court's analysis confused the question of whether the relief requested is legally available—a merits issue—with the "redressability" question of whether "the relief *requested*," if granted, would "have remedied the[] injury in fact." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 96 (1998).

The Supreme Court has explained the difference between those two concepts. For example, in *Davis*, the petitioner argued "that a criminal defendant will lack Article III standing to challenge an existing Fourth Amendment precedent if the good-faith exception to the exclusionary rule precludes the defendant from obtaining relief based on police conduct that conformed to that precedent." 564 U.S. at 249 n.10. The Court explained that that "argument confuse[d] weakness on the merits with absence of Article III standing." *Id.* Analogously, in *Chafin v. Chafin*, 568 U.S. 165, 174 (2013), the Court rejected the argument that the case was "moot because the District Court lack[ed] the authority to issue a re-return order either under the [Hague] Convention or … its inherent equitable powers." It noted, "that

44

argument—which goes to the meaning of the Convention and the legal availability of a certain kind of relief—confuses mootness with the merits." *Id.*; *see also, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 500 (1969) (declining to address argument that because petitioner "brought the wrong action, a dismissal for mootness is appropriate," which "confuse[d] mootness with whether [petitioner had] established a right to recover"). Similarly, here, the district court's analysis confused the question whether its equitable power extended to enjoining judges with whether the government has Article III standing to seek that relief.

To the extent the district court relied on *Buscemi v. Bell*, 964 F.3d 252 (4th Cir. 2020), for a contrary understanding, it erred. *See* JA185. True, *Buscemi* said that redressability requires "that the court has the power to grant the plaintiff's requested relief." 964 F.3d at 259. But it also said that, in "determining the scope of a court's remedial power," the Court assumes "that a claim has legal merit." *Id.* (cleaned up). What the district court did here, by contrast, was find that the government could not prevail on the merits because of immunity and therefore lacked standing. Nothing in *Buscemi* suggests that the mere existence of non-jurisdictional immunity defeats redressability, whether or not redressability may be lacking if, for example, there is an independent *jurisdictional* bar on granting the relief requested.

45

Understanding *Buscemi* to say otherwise would be contrary to the Supreme Court's repeated instruction in cases like *Davis* and *Chafin*, and it would also be contrary to countless cases recognizing that plaintiffs have standing to seek *damages* even if recovery might be barred by *qualified* immunity. In any event, *Buscemi*'s statement matters only if the district court's underlying analysis regarding the unavailability of injunctive relief is correct. And it is not.

Beyond *Buscemi*, the district court primarily relied on three Supreme Court decisions to support its reasoning that the availability (or not) of injunctive relief goes to standing: *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); and *United States v. Texas*, 599 U.S. 670 (2023). None of those cases supports turning the availability of injunctive relief into a standing defect.

*Lyons* held that the plaintiff lacked standing to seek an injunction against certain police conduct that he had not shown would be used against him in the future. *See* 461 U.S. at 97. The Court addressed *separately* whether the "equitable remedy [was] unavailable" because Lyons could not show *irreparable* injury, but it did not suggest that standing would be lacking if an injury was imminent but not irreparable. *Id.* at 111.

46

*TransUnion* addressed whether the risk of harm asserted by the plaintiffs was sufficiently "concrete" for injury in fact. 594 U.S. at 424-42. In the course of its analysis, the Court held that although "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief," that "does not necessarily mean that" he also "has standing to seek retrospective damages." *Id.* at 435–36. That principle has no relevance here. The district court agreed that the government asserted a present, ongoing harm, JA184, and the government sought relief that would stop that harm.

In *Texas*, the Court held that States lacked standing to seek an order "ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions." 599 U.S. at 677. Although the district court invoked Justice Gorsuch's concurrence for the proposition that a "forbidden" remedy creates a redressability problem, JA186 (quoting *Texas*, 599 U.S. at 690 (Gorsuch, J., concurring)), the concurrence's reasoning was predicated on 8 U.S.C. § 1252(f)(1)'s express bar on district courts' exercise of "jurisdiction or authority to enjoin or restrain the operation of certain immigration laws," *Texas*, 599 U.S. at 690 (Gorsuch, J., concurring).

No standing defect affects the government's claim for injunctive relief. The district court erred in dismissing it.

47

### D. Appeals or mandamus in individual cases are no substitute for this action.

The district court said that the government could avoid this lawsuit's perceived procedural problems by appealing or seeking mandamus in individual cases or by asking the Fourth Circuit Judicial Council to review the Standing Orders' validity, and it relied on the perceived availability of those options as a reason not to find a cause of action. JA202-208. But those options would not solve the problem for numerous reasons.

For example, appeals of the Standing Orders' entry in individual cases would face threshold barriers. Appellate jurisdiction would be one potential barrier. *See Virginia v. Tenneco, Inc.*, 538 F.2d 1026, 1029-30 (4th Cir. 1976). So would mootness, as the Standing Orders (as entered in individual cases) could expire before an appeal could be resolved. *See, e.g., In re Capitol Broad. Co., Inc.*, 19 F.4th 385, 394 (4th Cir. 2021) (dismissing appeal as moot when parties sought review of district court "orders [that] are no longer in effect").

Moreover, in many cases subject to the Standing Orders, Title 8's jurisdictional bars strip the district court of authority to act at all, which could complicate the presiding district judge's ability to provide a definitive ruling on the Standing Orders' validity and tee up the issue for appeal. And in any given case, the alien petitioner may have had little incentive to litigate

48

the Standing Orders' validity. For one thing, the time and effort required to do so could as easily be spent litigating a traditional motion for equitable relief. For another, if and when the alien petitioner is removed, he would no longer have motivation (or even ability) to litigate the injunction entered under the Standing Orders (even if it were not moot through expiration).

As for mandamus, courts have at times rebuffed efforts to facially challenge local rules in mandamus petitions. *Sheldon Whitehouse*, 53 F.3d at 1353 (recounting that court dismissed U.S. Attorney's attempt to challenge rule via mandamus petition). Even without such precedents, the high barrier to mandamus relief—"clear and indisputable" error—means that under the district court's ruling, illegal standing orders are practically immunized from as-applied review if their illegality is debatable. *See Musk*, 2026 WL 626965, at *2. That does not make sense. In most other contexts, litigants are not required to prove their case simply to come into court. Thus, the most effective (as well as the most judicially economical) method of seeking redress here was through a facial challenge to the Standing Orders. *See id.* It is also worth noting that *even if* as-applied challenges in particular cases were a realistic alternative, the availability of such challenges would not *foreclose* a facial challenge. *Cf. Ass'n of Am. R.R. v. Hudson,* 144 F.4th 582, 591 (4th Cir. 2025) (holding that although many claims under the Interstate

49

Commerce Commission Termination Act "proceed on an as-applied basis," "nothing in our caselaw should be understood to foreclose the possibility of a facial challenge").

The district court found that *Sheldon Whitehouse* did not support the government here in part because of the different procedural history of that case: the U.S. Attorney sought other avenues that the appellate court rejected before he brought the facial lawsuit. JA204-205. That history does not change the fact that the First Circuit expressly deemed a lawsuit for declaratory or injunctive relief the proper method for challenging a local rule. 53 F.3d at 1353. The district court also reasoned that the First Circuit addressed (and relied on precedents addressing) challenges to rules originating in state courts—"inferior sovereigns," in the district court's telling—that were merely adopted by federal courts. JA205-206. Why the rules' origins should matter when federal courts undisputedly adopted them is not self-evident—and it depends on the district court's intuition that state courts are inferior or less important: an intuition at odds with our constitutional structure.

Finally, the district court relied on *United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004), to support its theory that mandamus and appeal are "adequate … remedies" for the government. JA207. But *Zingsheim*'s

50

holding does not reach that far. There, the Seventh Circuit held that mandamus was not the proper vehicle for a facial challenge to a standing order where the government could (and *did*) appeal the district court's adverse decision applying the standing order. 384 F.3d at 870. As the district court here acknowledged, *Zingsheim* did not rule on the propriety of a facial suit for declaratory and injunctive relief. JA208 ("Of course, the Seventh Circuit's discussion did not address whether the Executive Branch could sue the district court to enjoin application of an allegedly *ultra vires* rule."). And although the Seventh Circuit noted that the Judicial Council "could evaluate" the government's "concerns," *Zingsheim*, 384 F.3d at 870, it did not hold that seeking review by the Judicial Council was the only route to challenge a standing order. After all, if the district court's reading of *Zingsheim* were correct, it would suggest that the many courts that have entertained facial challenges to local rules and standing orders should not have done so. Yet they did. This lawsuit is not only proper, but it is also the most efficient means of resolving the government's substantive and procedural concerns with the Standing Orders. The district court erred in dismissing it on threshold grounds.

51

### III.   The Standing Orders Were Unlawful.

For any of three independent reasons, the Standing Orders were unlawful. They mandated issuance of equitable relief without compliance with the requirements for issuing such relief, ignored the limits Congress placed on district courts' authority in immigration matters, and were promulgated without required notice and opportunity for comment.

### A.   The Standing Orders required preliminary equitable relief to be granted without satisfying the minimum legal requirements.

First, the Standing Orders were unlawful because they flouted basic requirements for issuing preliminary equitable relief under federal law. Courts must apply the traditional four-factor test before issuing equitable relief such as a preliminary injunction, temporary restraining order, or stay of removal. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008). There is no exception to that principle for aliens who may be removed during the pendency of litigation. Indeed, a leading case on the standard arose in just that context. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). The Standing Orders violated that basic requirement by authorizing equitable relief automatically and without consideration of *any* of the required factors.

The Standing Orders could not have been categorically justified under the traditional equitable considerations, either. As to their likelihood of

success on the merits, the habeas petitions to which the Standing Orders applied were, if anything, unlikely to succeed on the merits in view of the interlocking jurisdictional limitations in this context. And the habeas petitioners who benefitted from the Standing Orders were, if anything, unlikely to be irreparably harmed absent preliminary relief, since removal "is not categorically irreparable." *Nken*, 556 U.S. at 435. By allowing the hypothetical possibility of removal to create an automatic entitlement to an injunction, the Standing Orders either ignored the considerations *Nken* prescribed or evaluated them in a way *Nken* prohibits.

Meanwhile, the harms the Standing Orders *did* cite, "frustrating hearings" and "scheduling difficulties," are not harms (let alone irreparable harms) to the *parties* in individual habeas cases. They reflect interests of the *courts*. "Parties' procedural rights cannot be sacrificed in the interest of moving busy dockets." *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1008 n.7 (11th Cir. 1992).

The Standing Orders evidently directed entry of a temporary restraining order or preliminary injunction, by specifying that they "ENJOIN[ED]" and "RESTRAIN[ED]" the "Government/Respondents" from engaging in the prohibited activities of "removing Petitioners from the continental United States or altering their legal status." JA65; *see* JA61; *see*

53

*also Nken*, 556 U.S. at 429 (contrasting core features of injunctive relief and stays). But they skipped past key requirements governing those forms of relief.

Start with temporary restraining orders. Temporary restraining orders that—as the Standing Orders directed—issue without pre-order notice to the opposing party may be issued only upon (1) the court's receipt of specific facts in an affidavit or verified complaint that clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and (2) certification in writing by the movant's attorney of any efforts made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b)(1). An *ex parte* temporary restraining order must also state the date and hour it was issued, describe the injury and state why it is irreparable, and state why the order was issued without notice. *Id.* R. 65(b)(2). The Standing Orders purported to direct issuance of *ex parte* temporary restraining orders without meeting any of those requirements.

If the Standing Orders were instead understood as directing entry of a preliminary injunction, they would likewise have been unlawful. Preliminary injunctions may be issued "only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). They must be supported by a statement of reasons for the

54

injunction. *Id.* R. 65(d)(1). Preliminary injunctions bind only the parties to the case, together with the parties' officers, agents, servants, employees, attorneys, and others who are in active concert or participation with them— but only if those persons receive actual notice of the preliminary injunction. *Id.* R. 65(d)(2). And preliminary injunctions must require movants to provide security. *See id.* R. 65(c). The Standing Orders failed to meet any of those requirements.

Nor could the Standing Orders have validly relied on the All Writs Act or created a novel form of equitable relief. *See* JA61, JA64 (citing All Writs Act as a source of authority). The All Writs Act does not empower courts to circumvent mandatory requirements for issuing relief. A court "cannot use that Act to circumvent statutory requirements or otherwise binding procedural rules." *Shoop v. Twyford*, 596 U.S. 811, 820 (2022). Otherwise, no rule would really be binding; courts could evade the rules' requirements simply by relying on the All Writs Act to enter a similar but slightly less demanding remedy.

## B. The Standing Orders operated without regard to district courts' limited authority in immigration matters.

Independently, the Standing Orders were unlawful because they exceeded district courts' limited authority in immigration matters.

55

At the outset, the Standing Orders were unlawful because they impermissibly directed entry of relief to an entire group of aliens. Congress stripped lower federal courts of "jurisdiction or authority to enjoin or restrain the operation of" many provisions of the INA, including removal proceedings and procedures for removal of aliens ordered removed. 8 U.S.C. § 1252(f)(1); *see, e.g.*, 8 U.S.C. §§ 1229a (removal proceedings), 1231 (removal). The Standing Orders purported to bar entry and execution of removal orders for *all* aliens detained in Maryland who file a habeas petition in the District of Maryland. Therefore, they purported to enjoin and restrain provisions covered by the INA in a non-individualized, quasi-class manner. The Standing Orders thus exceeded courts' jurisdiction and authority. *See Aleman Gonzalez*, 596 U.S. at 550-51.

The Standing Orders also exceeded courts' lawful authority by entering relief automatically, without consideration of the numerous case-specific jurisdictional bars Congress has enacted to limit district courts' authority. In the ordinary course, Congress has channeled the vast majority of immigration-related matters to the courts of appeals on petitions for review of proceedings before immigration judges. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9). Yet the Standing Orders purported to grant relief to any alien who filed a

habeas petition, without permitting any analysis of whether the district court had jurisdiction to issue that relief.

Congress has also provided other specific bars that the Standing Orders prevented district judges from considering. Take three examples:

- Section 1252(g) deprives district courts of jurisdiction to issue orders that stay the execution of removal orders and to hear cases challenging the execution of removal orders outside the petition-for-review framework of § 1252. 8 U.S.C. § 1252(g); *see Reno*, 525 U.S. at 492; *Miranda v. Garland*, 34 F.4th 338, 355 (4th Cir. 2022); *Mapoy*, 185 F.3d at 228-29.

- Section 1226(e) "precludes an alien from challenging a discretionary judgment by the Attorney General or a decision that the Attorney General has made regarding his detention or release." *Jennings v. Rodriguez*, 583 U.S. 281, 295 (2018) (cleaned up); *see* 8 U.S.C. § 1226(e); *see also Miranda*, 34 F.4th at 353.

- Section 1252(e)(2) stripped federal courts of jurisdiction to hear challenges to expedited removal except on three narrow grounds. *See* 8 U.S.C. § 1252(e)(2); *Thuraissigiam*, 591 U.S. at 111.

But under the Standing Orders, the District of Maryland purported to exercise judicial power over all habeas petitions filed under 28 U.S.C. § 2241 for aliens located in Maryland at the time of filing, without giving effect to or even considering any of these or other bars.

## C.    The Standing Orders were promulgated without compliance with the procedural requirements for local rules.

Last, the Standing Orders were invalid because they were not validly promulgated. The Standing Orders functioned as local rules, but they did not go through the procedures required to promulgate a local rule.

Although the Standing Orders were not styled as local rules, "it matters not at all what" the parties "choose to call" them. *Baylson v. Disciplinary Bd. of Sup. Ct. of Pa.*, 975 F.2d 102, 111 (3d Cir. 1992). In function and effect, the Standing Orders were local rules because they governed "the conduct of [the court's] business" by directing the entry of an injunction in all habeas petitions filed under § 2241 on behalf of alien detainees located in the District of Maryland, regardless of the judge assigned to the case. 28 U.S.C. § 2071(a). "If the purpose of … local procedures, practices or policies is to control practice in a district court … , such procedures effectively are local rules and must be created in accordance with Rule 83." *Brown*, 960 F.2d at 1008 n.8; *accord Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir. 1995).

58

Local rules may be adopted only via notice-and-comment rulemaking. *See* 28 U.S.C. § 2071(b); Fed. R. Civ. P. 83(a)(1); *Hollingsworth v. Perry*, 558 U.S. 183, 193-94 (2010). The Standing Orders survived no such process, and they were not submitted to a rules advisory committee, the judicial council of the Fourth Circuit, or the Judicial Conference. *See* 28 U.S.C. §§ 2071(c), 2077. They therefore violated § 2071. *See Baylson v. Disciplinary Bd. of Sup. Ct. of Pa.*, 764 F. Supp. 328, 336 (E.D. Pa. 1991) (holding that amendments to local rules were invalid because district courts "did not utilize advisory committees" or go through notice-and-comment), *aff'd*, 975 F.2d 102 (3d Cir. 1992); *Hollingsworth*, 558 U.S. at 193-94. Indeed, when the District of Maryland superseded the Standing Orders with the Second Amended Standing Order, it did so through notice and comment, readily demonstrating the feasibility and propriety of that process. *See supra* p. 16.

## CONCLUSION

For the foregoing reasons, the Court should either reverse the judgment or dismiss the appeal as moot and vacate the district court's decision under *Munsingwear*.

59

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
    *Attorney General*

DREW C. ENSIGN
  *Deputy Assistant Attorney*
    *General*

<u>*s/ Elizabeth Hedges*</u>
ELIZABETH HEDGES
SARAH WELCH
  *Counsel to the Assistant Attorney*
    *General*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(771) 209-1978*
  *Elizabeth.T.Hedges@usdoj.gov*

March 30, 2026

60

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,995 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*s/ Elizabeth Hedges*

Elizabeth Hedges

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*s/ Elizabeth Hedges*

Elizabeth Hedges

# ADDENDUM

## TABLE OF CONTENTS

8 U.S.C. § 1226(e) ............................................................ Add. 1

8 U.S.C. § 1252(a)(5), (b)(9), (e)(2), (f)(1), (g) ................................... Add. 1

28 U.S.C. § 2071 ............................................................. Add. 3

Fed. R. Civ. P. 65(a)-(d) ...................................................... Add. 4

**8 U.S.C. § 1226(e)**

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole.

**8 U.S.C. § 1252(a)(5)**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e). For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

**8 U.S.C. § 1252(b)(9)**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

Add. 1

**8 U.S.C. § 1252(e)(2)**

Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—

> (A) whether the petitioner is an alien,

> (B) whether the petitioner was ordered removed under such section, and

> (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

**8 U.S.C. § 1252(f)(1)**

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

**8 U.S.C. § 1252(g)**

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

Add. 2

**28 U.S.C. § 2071**

(a) The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under section 2072 of this title.

(b) Any rule prescribed by a court, other than the Supreme Court, under subsection (a) shall be prescribed only after giving appropriate public notice and an opportunity for comment. Such rule shall take effect upon the date specified by the prescribing court and shall have such effect on pending proceedings as the prescribing court may order.

(c)    (1) A rule of a district court prescribed under subsection (a) shall remain in effect unless modified or abrogated by the judicial council of the relevant circuit.

(2) Any other rule prescribed by a court other than the Supreme Court under subsection (a) shall remain in effect unless modified or abrogated by the Judicial Conference.

(d) Copies of rules prescribed under subsection (a) by a district court shall be furnished to the judicial council, and copies of all rules prescribed by a court other than the Supreme Court under subsection (a) shall be furnished to the Director of the Administrative Office of the United States Courts and made available to the public.

(e) If the prescribing court determines that there is an immediate need for a rule, such court may proceed under this section without public notice and opportunity for comment, but such court shall promptly thereafter afford such notice and opportunity for comment.

(f) No rule may be prescribed by a district court other than under this section.

Add. 3

**Fed. R. Civ. P. 65(a)-(d)**

(a) Preliminary Injunction.

(1) *Notice.* The court may issue a preliminary injunction only on notice to the adverse party.

(2) *Consolidating the Hearing with the Trial on the Merits.* Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial.

**(b) Temporary Restraining Order.**

(1) *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

(2) *Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

Add. 4

(3) *Expediting the Preliminary-Injunction Hearing.* If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

(4) *Motion to Dissolve.* On 2 days' notice to the party who obtained the order without notice--or on shorter notice set by the court--the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

(c) Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

(d) Contents and Scope of Every Injunction and Restraining Order.

(1) *Contents.* Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its terms specifically; and

(C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

(2) *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:

(A) the parties;

(B) the parties' officers, agents, servants, employees, and attorneys; and

Add. 5

(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).