**No. 25-2004**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Plaintiffs-Appellants*,

v.

JUDGE MATTHEW JAMES MADDOX, in his official capacity; JUDGE ADAM B. ABELSON, in his official capacity; JUDGE RICHARD D. BENNETT, in his official capacity; JUDGE DEBORAH K. CHASANOW, in her official capacity; JUDGE THEODORE D. CHUANG, in his official capacity; JUDGE JAMES K. BREDAR, in his official capacity; JUDGE DEBORAH L. BOARDMAN, in her official capacity; JUDGE LYDIA KAY GRIGGSBY, in her official capacity; JUDGE STEPHANIE A. GALLAGHER, in her official capacity; JUDGE ELLEN LIPTON HOLLANDER, in her official capacity; JUDGE BRENDAN A. HURSON, in his official capacity; JUDGE JULIE R. RUBIN, in her official capacity; CATHERINE M. STAVLAS, in her official capacity as Clerk of Court; UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND; CHIEF JUDGE GEORGE L. RUSSELL, III, in his official capacity; JUDGE PAULA XINIS, in her official capacity,

*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Maryland,
No. 1:25-cv-02029

## RESPONSE BRIEF FOR DEFENDANTS-APPELLEES

PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendants-Appellees*

April 29, 2026

## CORPORATE DISCLOSURE STATEMENT

To the extent Fourth Circuit Rule 26.1(a)(1)(A) requires Defendants-Appellees (collectively, "the District Court") to file a disclosure statement, the District Court hereby certifies that no Defendant-Appellee is a publicly held entity, has any parent corporation, or is a trade association. The District Court further certifies that no publicly held entity has a direct financial interest in the outcome of the litigation, that this case does not arise out of a bankruptcy proceeding, and that this is not a criminal case in which there was an organizational victim.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES................................................................ iv

INTRODUCTION ............................................................................. 1

STATEMENT OF THE ISSUES ........................................................ 4

BACKGROUND .............................................................................. 5

    A.    Legal Background ............................................................ 5

    B.    Factual Background........................................................... 7

    C.    Procedural Background ....................................................11

SUMMARY OF ARGUMENT............................................................ 18

ARGUMENT ................................................................................... 21

I.    This Lawsuit Fails At The Threshold ......................................... 21

    A.    The Executive Is Not Empowered To Mount a Facial Attack on a Coordinate Branch of Government ........................... 21

    B.    Defendants Are Immune From Suit ................................... 31

    C.    The Executive Lacks Standing to Seek Injunctive Relief Against the Judiciary ..................................................... 36

II.    This Case Is Not Moot.............................................................. 39

III.    The Executive's Merits Arguments Are Meritless......................... 41

    A.    The Standing Order Is Not Facially *Ultra Vires* .............. 42

    B.    The Standing Order Does Not Impermissibly Award Equitable Relief..................................................... 43

CONCLUSION ............................................................................................... 50

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025)..........................................................................................7

*Abrego Garcia v. Noem*,
2025 WL 1021113 (4th Cir. 2025)...................................................... 10, 19, 20

*Akinro v. Blake*,
2007 WL 3020186 (D. Md. 2007) .........................................................34

*Alam v. Nielsen*,
312 F.Supp.3d 574 (S.D. Tex. 2018)....................................................44

*Appalachian Voices v. U.S. Dep't of the Interior*,
78 F.4th 71 (4th Cir. 2023)...................................................................45

*Atchison v. U.S. Dist. Cts.*,
190 F.Supp.3d 78 (D.D.C. 2019) ..........................................................31

*Belbacha v. Bush*,
520 F.3d 452 (D.C. Cir. 2008) ..............................................................43

*Bolin v. Story*,
225 F.3d 1234 (11th Cir. 2000) ....................................................... 34, 38

*Boumediene v. Bush*,
553 U.S. 723 (2008)..............................................................................48

*Brownback v. King*,
592 U.S. 209 (2021)..............................................................................27

*Brusznicki v. Prince George's Cnty.*,
42 F.4th 413 (4th Cir. 2022)............................................... 20, 39, 41

*Butz v. Economou*,
438 U.S. 478 (1978)..............................................................................36

*Cabrera v. United States*,
2021 WL 4311255 (S.D.N.Y. 2021) ....................................................33

*Carter v. Clark*,
  616 F.2d 228 (5th Cir. 1980)..................................................................26

*Clinton v. City of New York*,
  524 U.S. 417 (1998)..........................................................................30

*Cordon-Salguero v. Noem*,
  No. 1:25-cv-1626 (D. Md. filed May 20, 2025)....................................10

*Cruz-Medina v. Noem*,
  No. 1:25-cv-1768 (D. Md. filed June 3, 2025)....................................10

*Dellinger v. Bessent*,
  766 F.Supp.3d 57 (D.D.C. 2025) .........................................................46

*Dellinger v. Bessent*,
  2025 WL 561425 (D.C. Cir. 2025) ............................................... 46, 47

*Dep't of Com. v. House of Representatives*,
  525 U.S. 316 (1999)..........................................................................24

*DHS v. Thuraissigiam*,
  591 U.S. 103 (2020)..................................................................... 8, 42

*Egbert v. Boule*,
  596 U.S. 482 (2022)..................................................................... 23, 28

*Fay v. Noia*,
  372 U.S. 391 (1963)..........................................................................48

*Flores v. Bondi*,
  No. 1:25-cv-1950 (D. Md. filed June 17, 2025)..................................11

*FTC v. Dean Foods Co.*,
  384 U.S. 597 (1966)..........................................................................21

*Gessele v. Jack in the Box Inc.*,
  --- F.4th ----, 2026 WL 1075915 (9th Cir. Apr. 20, 2026) .................38

*Gibson v. Goldston*,
  85 F.4th 218 (4th Cir. 2023)........................................................ 14, 33

*Gonzalez-Pablo v. Mason*,
   788 F.Supp.3d 759 (S.D. W. Va. 2025)........................................44

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999)........................................14

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)........................................47

*Hernandez Escalante v. Noem*,
   No. 1:25-cv-1799 (D. Md. filed June 6, 2025)........................................11

*Hernandez v. Baker*,
   No. 1:25-cv-1663 (D. Md. filed May 23, 2025)........................................10

*Hernandez v. Mesa*,
   589 U.S. 93 (2020)........................................ 28, 29

*In re Capitol Broad. Co.*,
   19 F.4th 385 (4th Cir. 2021)........................................28

*In re Debs*,
   158 U.S. 564 (1895)........................................ 19, 22-24

*In re McBryde*,
   117 F.3d 208 (5th Cir. 1997)........................................38

*In re McDonald*,
   489 U.S. 180 (1989)........................................45

*Lancaster v. Sec'y of Navy*,
   109 F.4th 283 (4th Cir. 2024)........................................28

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936)........................................ 25, 33

*Learning Res., Inc. v. Trump*,
   146 S.Ct. 628 (2026)........................................24

*M.S.P.C. v. CBP*,
   60 F.Supp.3d 1156 (D.N.M. 2014)........................................44

*Majerska v. United States*,
    2021 WL 4739602 (D.N.J. 2021) .............................................................33

*McCargo v. Hedrick*,
    545 F.2d 393 (4th Cir. 1976) ...................................................................28

*Mireles v. Waco*,
    502 U.S. 9 (1991) .....................................................................................32

*Mullis v. U.S. Bankr. Ct. for Dist. of Nevada*,
    828 F.2d 1385 (9th Cir. 1987) .................................................................36

*N.C. Right to Life, Inc. v. Leake*,
    525 F.3d 274 (2008) .................................................................................25

*N.Y. State Rifle & Pistol Ass'n v. City of New York*,
    590 U.S. 336 (2020) ........................................................................... 40, 41

*NAAMJP v. Holder*,
    2015 WL 13158479 (D. Md. 2015) ..........................................................26

*NAAMJP v. Roberts*,
    180 F.Supp.3d 46 (D.D.C. 2015) .............................................................26

*Nat'l Council of Nonprofits v. OMB*,
    763 F.Supp.3d 13 (D.D.C. 2025) .............................................................44

*Newsome v. Merz*,
    17 F.App'x 343 (6th Cir. 2001) ...............................................................34

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................2

*Perez-de Ramos v. Noem*,
    No. 1:25-cv-1673 (D. Md. filed May 25, 2025) ......................................10

*Pulliam v. Allen*,
    466 U.S. 522 (1984) ...................................................................... *passim*

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................... 30, 37

*Rehberg v. Paulk*,
  566 U.S. 356 (2012)................................................................29

*Russell v. Hug*,
  275 F.3d 812 (9th Cir. 2002).................................................26

*S. Walk at Broadlands Homeowner's Ass'n*
  *v. OpenBand at Broadlands, LLC*,
  713 F.3d 175 (4th Cir. 2013).................................................36

*S.L.V. v. Rosen*,
  2021 WL 243442 (W.D. Tex. 2021).......................................44

*Sanitary Dist. of Chi. v. United States*,
  266 U.S. 405 (1925)...............................................................24

*Schiavo ex rel. Schindler v. Schiavo*,
  403 F.3d 1223 (11th Cir. 2005)..............................................28

*Sheppheard v. Morrisey*,
  143 F.4th 232 (4th Cir. 2025)................................................37

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*,
  214 F.3d 4 (1st Cir. 2000) .....................................................24

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)...............................................................25

*Talebinejad v. Baker*,
  No. 1:25-cv-2024 (D. Md. filed June 24, 2025).....................10

*Thaw v. Lynch*,
  2016 WL 1045527 (D. Ariz. 2016)........................................26

*Trump v. CASA*,
  606 U.S. 831 (2025)......................................................... 19, 37

*Trump v. J.G.G.*,
  604 U.S. 670 (2025)........................................................... 8, 42

*Trump v. United States*,
  603 U.S. 593 (2024)...............................................................30

*United States v. Mitchell*,
    463 U.S. 206 (1983)..................................................................31

*United States v. Morgan*,
    313 U.S. 409 (1941)..................................................................49

*United States v. Munsingwear, Inc.*,
    340 U.S. 36 (1950)....................................................................4

*United States v. Raines*,
    362 U.S. 17 (1960)............................................................. 22, 29

*United States v. Robinson*,
    159 F.4th 277 (4th Cir. 2025)...................................................38

*United States v. Salerno*,
    481 U.S. 739 (1987)..................................................................42

*United States v. Shipp*,
    203 U.S. 563 (1906)..................................................................43

*United States v. Texas*,
    144 S.Ct. 797 (2024)..................................................... 16, 43, 46

*United States v. Windsor*,
    570 U.S. 744 (2013)....................................................................3

*United States v. Zingsheim*,
    384 F.3d 867 (7th Cir. 2004).............................................. 18, 26, 32

*Vijender v. Wolf*,
    2020 WL 1935556 (D.D.C. 2020) ..............................................44

*Virginia v. Tenneco, Inc.*,
    538 F.2d 1029 (4th Cir. 1976)...................................................28

*Whitehouse v. Dist. Ct. for the Dist. of R.I.*,
    53 F.3d 1349 (1st Cir. 1995) .....................................................25

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021)............................................................. 33, 34

ix

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)................................................................28

**Constitutional Provision and Statutes**

U.S. Const. art. I, §9, cl. 2..........................................................23

8 U.S.C. §1101 *et seq.*...............................................................5

8 U.S.C. §1252(a)(5)....................................................................5

28 U.S.C. §1651...........................................................................43

28 U.S.C. §2071(c)(1)............................................... 12, 27, 32

**Rules**

1st Cir. L. R. 18.0.............................................................. 6, 42

6th Cir. L. R. 18..........................................................................6, 7

Fed. R. Civ. P. 65(b)(2) ..........................................................47

**Other Authorities**

3d Cir. Standing Ord. Regarding Immigr. Cases (Aug. 5, 2015),
    https://perma.cc/U68M-XGXF ...........................................6

4th Cir. Standing Ord. 19-01 (Oct. 21, 2019),
    https://perma.cc/9Q4F-J4SL ...................................... 1, 5, 8

9th Cir. Gen. Ord. 6.4(c)(1),
    https://perma.cc/RDA5-QNNC .............................................6

Rachel Bayefsky, *Administrative Stays: Power and Procedure*,
    97 Notre Dame L. Rev. 1941 (2022) ............................ 44, 46

Br. for U.S., *FS Credit Opportunities Corp.*
    *v. Saba Cap. Master Fund, Ltd.*, No. 24-345, 2025 WL 2597327
    (U.S. Sept. 3, 2025)....................................................22

Emergency Mot. for Stay Pending Appeal,
    *Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 11, 2025)...........46

Letter from Honorable Judge Jon O. Newman to David McConnell,
Director, Off. of Immigr. Litig., U.S. Dep't of Just. (Mar. 16, 2009),
*attached to* Decl. of Brandon M. Waterman,
*Rone v. Shanahan*, No. 16-1541 (2d Cir. Aug. 19, 2016), Dkt.21-3.....................7

Notice of Proposed and Adopted Amends. (6th Cir. June 30, 2025),
https://perma.cc/SW4J-Q6ZM..............................................................................6

Ord., *Ghamelian v. Baker*,
No. 1:25-cv-2106 (D. Md. July 1, 2025), Dkt.5 .................................................10

Reply in Supp. of Emergency Mot. for a Stay Pending Appeal,
*Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 12, 2025)............................47

Second Amended Standing Ord. 2025-01 (D. Md. Dec. 1, 2025)..................... 16, 45

U.S. Dist. Ct. for the Dist. of Md.,
*Proposed Amendments to the Local Rules* (Sept. 12, 2025),
https://perma.cc/NNQ7-6P7F ............................................................................16

## INTRODUCTION

This extraordinary branch-on-branch lawsuit is unprecedented for a reason: It is fundamentally incompatible with the constitutional separation of powers. As the out-of-district court forced to sit in judgment of its sister district correctly concluded, the Executive lacks the power to bring it several times over. And, in all events, this lawsuit is meritless. This Court should affirm.

Last May, amidst the Executive's energetic efforts martialing all available authority to effectuate alien removal, the United States District Court for the District of Maryland faced a flood of last-minute immigration petitions leaving little room for orderly proceedings. In response, the District Court took a page out of this Court's playbook and issued a standing order establishing a procedure to ensure that it would have a minimal reasonable interval (roughly 48 hours) to docket each petition and assess its jurisdiction before the petition could be overtaken by events. *Cf.* 4th Cir. Standing Ord. 19-01 (automatically staying removal for 14 days). The Executive reacted to that ordinary docket-control mechanism with an extraordinary response. Instead of raising its objections in an individual case in which the standing order was applied, the Executive sued the District Court—and every single judge on it, as well as its clerk of court—and, having recused every judge in the district, asked a judge from *another* district to invalidate the order and enjoin the District Court

from relying on it in any and all cases. Judge Cullen properly recognized the Executive's gambit as *ultra vires* and promptly dismissed it.[1]

On appeal, the Executive tries to reframe its unprecedented overreach as a prosaic dispute about the limits of district courts' jurisdiction under the Immigration and Nationality Act. It is not. This case is about the bedrock ability of federal-court judges to "ensur[e] that [they] can responsibly fulfill their role in the judicial process." *Nken v. Holder*, 556 U.S. 418, 427 (2009). This Court and others have done so for years through analogous mechanisms to protect jurisdiction, which actually impose greater, though still modest, intrusions on alien removal. To the District Court's knowledge, the Executive has never sought to challenge any of those mechanisms. Nor does the Executive make any effort to distinguish them, even though they served as a model for the order it does challenge.

Instead, the Executive urges a version of the separation of powers where only one branch is truly sovereign and can assail judicial rules not as an incidental feature of ordinary controversies but via frontal assaults, in this case against the District Court, but in theory against this Court or the Supreme Court itself. That is decidedly not "how the system is supposed to work." *Contra* Exec.Br.1. "[T]he executive branch is not the sole sovereign in the United States of America." JA180. In our

---

[1] For clarity, this brief generally refers to Defendants-Appellees collectively as "the District Court," while referring to the court below as "Judge Cullen."

2

system, interbranch conflicts are resolved either as an incident to ordinary litigation or via the "innumerable ways" in which one branch can lean on another "without a lawsuit." *United States v. Windsor*, 570 U.S. 744, 790-91 (2013) (Scalia, J., dissenting). Here, for instance, nothing stopped the Executive from raising its concerns in an ordinary case. While it might have been necessary to invoke the capable-of-repetition doctrine or even appoint an amicus to secure an appellate determination, all of that would have been far less disruptive than what transpired below. In the alternative, the Executive could have asked Congress to pass legislation precluding standing orders in this context. Or it could have raised concerns with the Judicial Council and sought to initiate a back-and-forth with a coordinate branch to arrive at a solution that ensures that *both* branches can carry out their constitutionally assigned functions. The one thing it most certainly could not do is to sideline an entire Judicial District via a novel suit that is an obvious affront to the separation of powers.

Judge Cullen correctly treated this wolf as a wolf. The Executive simply does not have the power to sue the Judiciary. One need look no further than this case to see why. This litigation has profoundly disrupted the operations of the District of Maryland, converting its judges from adjudicators to party litigants forced to divert efforts from their busy dockets towards finding private counsel and formulating litigation strategy. And that is just the tip of the iceberg. If this misguided lawsuit

3

were allowed to proceed, tensions between the branches would only escalate, with Executive depositions of Judicial officers (and vice-versa) and cross-examinations in open court exploring Judicial motivations and Executive necessities. And if this first-of-its-kind lawsuit were to succeed, it would not be the last—and the next one could be against this Court (or the Supreme Court) and cause greater disruption still.

Indeed, even while claiming this case is moot, the Executive hastens to add that it thinks the revised standing order remains deficient and "will not hesitate to" reprise the very same arguments in new litigation against the District Court if it sees fit. CA4.Dkt.19-1 at 9 n.6. That lingering threat defeats a finding of mootness and squarely counsels against vacatur under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). This unprecedented effort deserves a precedential rebuke. "To hold otherwise would run counter to overwhelming precedent, depart from longstanding constitutional tradition, and offend the rule of law." JA176.

## STATEMENT OF THE ISSUES

1.      Whether the Executive Branch in its institutional capacity can hale the Judicial Branch in its institutional capacity into federal court and seek an injunction against it and its members enforceable through contempt.

2.      Whether revising a standing order moots a challenge to the original order when the plaintiff's grounds for challenge survive the revisions and the plaintiff admits that it "will not hesitate to" reprise them against the new order.

4

3.      Whether a district court considering a habeas petition filed by an alien detainee can temporarily preserve the status quo without considering the merits to ensure that it has time to make a preliminary assessment of its jurisdiction.

## BACKGROUND

### A.    Legal Background

For decades, the Executive channeled most of its immigration enforcement through the administrative scheme created by the INA, 8 U.S.C. §1101 *et seq.*, which generally funnels judicial review to the courts of appeals in the first instance by assigning them jurisdiction over petitions for review of final orders from the Board of Immigration Appeals. *See* 8 U.S.C. §1252(a)(5). Courts of appeals, in turn, have long employed procedures to impose an automatic temporary stay of removal when an alien petitions for judicial review. These procedures give courts a reasonable interval to docket the case and consider any ensuing stay request without fear that the Executive will take action that effectively moots review.

Some circuits, including this one, accomplish that end via standing orders. This Court's Standing Order 19-01 directs the clerk to "enter an administrative order staying removal for a period of 14 days" "[u]pon the filing of an initial motion for stay of removal or deportation in an immigration case," "to allow time for responsive filings and to preserve the court's ability to make a considered decision on the motion." 4th Cir. Standing Ord. 19-01 (Oct. 21, 2019), https://perma.cc/9Q4F-J4SL.

5

The Third Circuit likewise "direct[s]" its clerk "to administratively stay removal" "in immigration matters" "until such time as a motions panel can consider" a "timely filed" "motion for stay of removal." 3d Cir. Standing Ord. Regarding Immigr. Cases (Aug. 5, 2015), https://perma.cc/U68M-XGXF. And the Ninth Circuit has a similar general order under which, "[u]pon the filing of an initial motion or request for stay of removal or deportation, the order of removal or deportation is temporarily stayed until further order of the Court." 9th Cir. Gen. Ord. 6.4(c)(1), https://perma.cc/RDA5-QNNC.

Other circuits accomplish the same end via local rule or via less formal arrangements with the Executive. For example, First Circuit Local Rule 18.0 directs the clerk to "enter an administrative order staying removal for ten business days" upon a "motion for stay of removal," "[i]n order to ensure the orderly presentation of issues … in immigration cases and to preserve the Court's ability to make considered decisions in such cases." 1st Cir. L. R. 18.0, https://perma.cc/LZV4-BQRF. Citing "[a]n immediate need," in June of 2025 the Sixth Circuit announced an amendment to its Circuit Rule 18 to create a similar procedure effective immediately. *See* Notice of Proposed and Adopted Amends. (June 30, 2025), https://perma.cc/SW4J-Q6ZM; 6th Cir. L. R. 18. Under the Sixth Circuit's new rule, "[w]hen filing a motion for a stay of removal in immigration proceedings, a petitioner shall include any known information regarding the status and timing of

6

the removal." 6th Cir. L. R. 18. "Within 24 hours," the Executive must "file … a notice stating whether" it "has scheduled the petitioner's removal and, if so, the earliest date upon which the petitioner will be removed." *Id.* The court will then "decide … whether to administratively stay the order of removal pending resolution of the motion." *Id.* The Second Circuit has effectuated a default stay via a longstanding "forbearance agreement" with the Executive under which "no alien who has filed a petition for review and has also filed a motion for a stay of removal will be removed until the Court of Appeals has made a ruling" on the stay motion. Letter from Honorable Judge Jon O. Newman to David McConnell, Director, Off. of Immigr. Litig., U.S. Dep't of Just., at 2 (Mar. 16, 2009), *attached to* Decl. of Brandon M. Waterman, *Rone v. Shanahan*, No. 16-1541 (2d Cir. Aug. 19, 2016), Dkt.21-3.

### B.    Factual Background

Because the INA channels most litigation to courts of appeals, federal district courts traditionally had less occasion to confront a significant volume of immigration litigation or to fashion rules to accommodate it. That changed under the current Administration, which has increasingly sought to effectuate removals on an extraordinarily expeditious basis. *See, e.g.*, *A.A.R.P. v. Trump*, 605 U.S. 91, 92 (2025) (per curiam). Some of those removals have proceeded under the INA, which allows aliens to seek review in limited circumstances by filing a habeas petition in

district court. *See DHS v. Thuraissigiam*, 591 U.S. 103, 111 (2020). Other removals have proceeded under other statutory schemes, some of which require aliens seeking review to file a habeas petition in district court. *See, e.g.*, *Trump v. J.G.G.*, 604 U.S. 670, 672-73 (2025) (discussing the Alien Enemies Act of 1798).

As the press of emergency immigration litigation has shifted from appellate courts to district courts, so too have the pressures that prompted this Court and its appellate siblings to adopt modest measures "to allow time for responsive filings and to preserve the court's ability to make a considered decision." 4th Cir. Standing Ord. 19-01, *supra*. The United States District Court for the District of Maryland responded to those pressures by issuing a standing order temporarily preventing the Executive "from removing … or altering the[] legal status" of alien detainees who file "a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2241" giving their "full name and A#." JA61-62. Once the order was entered on the docket of a particular case, that bar would "remain in effect until 4:00 p.m. on the second business day following the filing of the Petition," unless extended or shortened by the presiding judge. JA62.

Like courts of appeals before it, the District Court explained that this brief pause was necessary:

> to preserve existing conditions and the potential jurisdiction of this Court over pending matters while the Court determines the scope of its authority to grant the request[ed] relief; to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief,

including participation in court proceedings and access to legal counsel for such purpose; to ensure the Court is able to evaluate their respective claims for relief based on their in-court testimony that may be offered; and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense.

JA61. Indeed, the most obvious difference between the District Court's standing order and this Court's Standing Order 19-01 is that the District Court gave itself and its judges only two days, rather than two weeks, for this preliminary assessment.

The District Court issued a slightly revised version of the standing order a week after promulgating the original one. The revisions provided additional context concerning "[t]he recent influx of habeas petitions concerning alien detainees purportedly subject to improper and imminent removal" and the "difficulties" the District Court had faced in reaching "hurried" decisions based on "elusive" information. JA64-65. The revised order also required the clerk of court to serve both the order and the underlying petition on "the Chief and Deputy Chief of the Civil Division of the United States Attorney's Office for the District of Maryland" any time the order is entered in a case, and stipulated that no stays would take effect until the clerk provided notice "that the documents ha[d] been transmitted." JA65.[2]

---

[2] After Judge Cullen dismissed this case in light of judicial immunity, the District Court amended the standing order yet again, after providing notice and soliciting comment, to provide additional context about when the automatic relief issues and how it operates. *See also infra* pp.15-17.

9

The Executive identifies 12 cases in which (it claims) these versions of the standing order were entered.[3] Exec.Br.14 & n.1. Far from "interfer[ing] with ICE's mission to administer and enforce the immigration laws, protect public safety, and promote national security," Exec.Br.12, the course of proceedings in those cases shows that the District Court carefully crafted the standing order to reflect "reciprocal respect for the roles of the Executive and the Judiciary," *Abrego Garcia v. Noem*, 2025 WL 1021113, at \*8 (4th Cir. 2025) (Wilkinson, J., concurring). In several cases, the automatic relief lapsed on its own terms after a prompt status conference revealed that removal was not imminent, so it never interfered with executive prerogatives at all. *See, e.g.*, *Hernandez v. Baker*, No. 1:25-cv-1663 (D. Md. filed May 23, 2025); *Cruz-Medina v. Noem*, No. 1:25-cv-1768 (D. Md. filed June 3, 2025); *Talebinejad v. Baker*, No. 1:25-cv-2024 (D. Md. filed June 24, 2025). In one case, the stay lapsed when the alien voluntarily dismissed her petition. *See Perez-de Ramos v. Noem*, No. 1:25-cv-1673 (D. Md. filed May 25, 2025). In another, the court extended the stay "without objection from the" Executive. Ord., *Ghamelian v. Baker*, No. 1:25-cv-2106 (D. Md. July 1, 2025), Dkt.5.

Even in cases where proceedings took slightly longer, judges gave them the utmost priority and advanced them with alacrity. *See, e.g.*, *Flores v. Bondi*, No. 1:25-

---

[3] We count 11; it does not appear that the standing order was entered on the docket in *Cordon-Salguero v. Noem*, No. 1:25-cv-1626 (D. Md. filed May 20, 2025).

cv-1950 (D. Md. filed June 17, 2025) (court denied TRO June 20 but extended the automatic stay; court dismissed the case on July 2, after receiving motion-to-dismiss briefing and holding a hearing). Indeed, even what the Executive describes as the most "[r]emarkabl[e]" example featured a highly expedited procedure in which the Executive promptly prevailed. Exec.Br.14-15 (citing *Hernandez Escalante v. Noem*, No. 1:25-cv-1799 (D. Md. filed June 6, 2025)). The petitioner there filed a petition on a Friday, *Escalante* Dkt.1, and the Executive moved to dismiss the following Monday, *Escalante* Dkt.4. The presiding judge held a telephone conference the next morning, during which she concluded that she needed to see adverse briefing to make an informed judgment, so she entered a new injunction and set a highly expedited briefing schedule: The petitioner's opposition was due six days later; the Executive's reply was due four days after that; and the judge held a hearing the next business day. *Escalante* Dkt.9. Two days later, the judge dissolved the injunction and granted the Executive's motion to dismiss. *Escalante* Dkt.18. All told, the entire proceedings lasted only a few days longer than the 14 days that this Circuit's standing order allows as a matter of course in every immigration case.

### C.    Procedural Background

1. To the extent the Executive felt aggrieved by these modest exercises of docket-management authority, it had several options at its disposal. It could have objected in an individual case and either sought emergency appellate relief or filed

11

an interlocutory appeal and invoked the capable-of-repetition-yet-evading-review exception to mootness.  Or it could have petitioned "the judicial council of" this Circuit to "modif[y] or abrogate[]" the standing order.  28 U.S.C. §2071(c)(1).  The Executive instead chose a quite different path, taking the extraordinary step of suing the District Court, every judge on it, and the clerk of court *en masse*.  The Executive alleged that the standing order was unlawful because it (1) permitted the grant of interim equitable relief without considering the four traditional equitable factors, JA15-18, (2) exceeded district courts' INA "jurisdiction and authority," JA18-19, and (3) should be construed as a local rule and be vacated for failure to comply with the notice-and-comment requirement of 28 U.S.C. §2071, JA20.  The complaint sought not only declaratory relief, but "preliminary and permanent injunctions that prohibit the Defendants," on pain of contempt sanctions, "from implementing or effectuating the Standing Order … and from enforcing [its] terms in any case." JA21.

Recognizing that the judges named as defendants could not viably hold themselves, their colleagues, or their court in contempt, the Executive moved for Defendants' blanket recusal and for "a duly selected judge from another District" to sit in judgment of the District Court.  JA23-25.  The Chief Judge of the District Court (himself a named defendant) promptly referred the motion to the Chief Judge of this Court.  JA27.  The Chief Judge of the District Court and his colleagues also began

12

the process of locating and retaining non-conflicted private counsel to defend them, the clerk, and the court itself, at taxpayer expense. This Court ultimately assigned the matter to Judge Cullen of the Western District of Virginia. *See* D. Ct. Minute Order (July 2, 2025).

2. The Executive asked Judge Cullen to preliminarily enjoin the District Court "from implementing or effectuating" the standing order during the pendency of the litigation. JA31, 52. The District Court opposed that request and cross-moved to dismiss the complaint on threshold justiciability grounds, including sovereign and judicial immunity as well as the lack of a cause of action. JA69-119.

Judge Cullen granted the motion to dismiss and denied the Executive's preliminary-injunction motion as moot. JA212. He began by noting that the District Court's standing order "effectively borrowed from the playbook of the federal courts of appeal" (including this one), "many of which impose temporary stays of removal when alien detainees file petitions for review of final orders of removal issued by the Board of Immigration Appeals," and further observed that the District Court's standing order was "considerably more modest" than those appellate mechanisms. JA174. But beyond that, Judge Cullen did not address the merits of the Executive's claims. Instead, he concluded that "[a]ny fair reading of the" relevant "legal authorities … leads to the ineluctable conclusion that this court has no alternative but to dismiss" the case on threshold justiciability grounds. JA176.

13

Judge Cullen first concluded that the Executive lacks standing to seek injunctive relief because "the court lacks authority to enjoin Defendants." JA185. As he explained, "the relevant question is 'whether the relief [the Executive] requested here was traditionally accorded by courts of equity.'" JA186 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). He concluded that "[t]he answer is a resounding no," as, "'[a]t the common law itself, there was no such thing as an injunction against a judge.'" JA186 (quoting *Pulliam v. Allen*, 466 U.S. 522, 529 (1984)).

Judge Cullen next concluded that "[t]he United States District Court for the District of Maryland, as an entity of the sovereign United States, is immune from suit and the Executive's claims against it"—declaratory and injunctive alike—"must be dismissed" for that reason too. JA188. Judge Cullen reached the same conclusion as to the judges the Executive sued, because "[i]ssuing an order is a judicial function" for which federal judges have immunity. JA197 (quoting *Gibson v. Goldston*, 85 F.4th 218, 223 (4th Cir. 2023)). And since the clerk of court's "only alleged sin is implementing the standing orders," Judge Cullen found the clerk "protected under the same doctrine." JA197.

Finally, Judge Cullen concluded that even if any of the defendants lacked immunity, he would "nevertheless dismiss the Executive's suit in its entirety for failure to state a claim." JA198. While "the Executive claim[ed] that the United

14

States of America can sue to enjoin any practice that infringes upon a sovereign interest," Judge Cullen declined to "extend that rule to imply a right that allows the Executive, on behalf of the United States, to sue a coordinate branch of government." JA199. As he explained, "[n]othing in the case law cited by the Executive suggests that it can sue a co-equal branch of government to vindicate a sovereign interest that is shared on both sides of the 'v.'" JA201. "To hold otherwise would give the Executive unconstitutional leverage over its equal branches of government, eviscerating the principles of checks and balances that are a hallmark of our constitutional order." JA201.

The Executive noticed an appeal within hours of that decision. JA213.

3. While the Executive's appeal was pending, the District Court sought to solicit public comment on potential refinements to the standing order. With the benefit of several more months of experience administering habeas petitions filed by aliens facing removal, as well as more insight into the Executive's concerns, the District Court proposed several refinements.

First, the District Court proposed confining operation of the order to cases where the petitioner requests its entry and certifies under Federal Rule of Civil Procedure 11 "that the Petitioner is presently detained in Maryland, that emergency relief is necessary, and that the Court has subject-matter jurisdiction over the Petition." Second Amended Standing Ord. 2025-01, at 2 (D. Md. Dec. 1, 2025),

15

*redline available at* https://perma.cc/XX2R-GFCW.  It further proposed making clear that "[t]he Clerk shall not docket this Order in a Petitioner's case until all the requirements listed in this paragraph have been met." *Id.*  The District Court also proposed clarifying that, rather than "ENJOIN[ING] and RESTRAIN[ING]" the Executive, the order "SUSPENDS the authority of Government/Respondents, including all those acting for them or on their behalf, to remove Petitioners from the continental United States, and SUSPENDS the effect of any change of the Petitioner's legal status that may deprive this Court of subject-matter jurisdiction over the Petition." *Id.*  Finally, the District Court proposed confirming that "[t]he presiding judge may extend or shorten this interval by separate order in an individual case to the extent more or less time is necessary 'to make an intelligent decision on' the requested emergency relief[,] *United States v. Texas*, 144 S.Ct. 797, 799 (2024) (Barrett, J., concurring)," and that "[t]he presiding judge may also dissolve the Order entirely upon good cause shown by the Government/Respondents[.]" *Id.* at 2-3.

Although the District Court maintained that the standing order is not a local rule subject to 28 U.S.C. §2071's notice-and-comment requirement, in an effort to receive the benefit of "stakeholders['] … varying perspectives" on "a matter of significant public importance," the District Court invited public comment on the proposed revisions, *see* U.S. Dist. Ct. for the Dist. of Md., *Proposed Amendments to the Local Rules* (Sept. 12, 2025), https://perma.cc/NNQ7-6P7F.  The Executive

16

submitted a comment maintaining that the proposed revisions are "equally misguided." CA4.Dkt.22-2 at 2. In its view, no matter what revisions the District Court might make, the standing order would remain "an overreach" that "usurps Executive Branch authority," "flouts congressional intent," and harms "the public" by "impair[ing] and frustrat[ing] ICE removal efforts." *Id.* at 2-3. And while the Executive acknowledged that the proposed certification requirement "may help reduce the amount of frivolous or procedurally defective habeas petitions," it claimed that would not ameliorate the "burden … on" the Executive, and even suggested that it could exacerbate that burden by precipitating "litigation over the accuracy of certifications." *Id.* at 3.

The District Court adopted the proposed revisions without change, promulgating the revised version of the standing order on December 1, 2025.

4. Six weeks after the current standing order was promulgated, the Executive moved to dismiss its own appeal as moot and for *Munsingwear* vacatur. CA4.Dkt.19-1. In the same breath, however, the Executive warned that it "intends to monitor and evaluate how the" operative version of the order "is applied in practice, and will not hesitate to seek judicial relief, whether in a new pre-enforcement challenge or in particular cases, if its rights and interests are being unlawfully infringed." *Id.* at 9 n.6. Though the District Court certainly would have

17

welcomed an end to this litigation, that reservation, along with the Executive's request for vacatur, forced it to oppose the motion.  CA4.Dkt.22-1.

On February 10, 2026, a panel of this Court denied the Executive's motion to dismiss, holding that "[t]he case is not moot."  CA4.Dkt.24.

## SUMMARY OF ARGUMENT

**I.** As Judge Cullen correctly held, this lawsuit fails at the threshold.  Under our system of government, the Executive does not just haul off and sue the Judiciary.  Instead, the Executive takes care that the laws are faithfully executed.  If a judicial rule or standing order interferes with that faithful execution or is *ultra vires*, there is a tried-and-true avenue for challenging that order in the context of an ordinary and actual case and controversy.  Such litigation would not require naming the entire District Court and its judicial officers as defendants, or necessitate the retention of private counsel or the assignment of out-of-district jurists.  But it would provide a well-trod path for potentially vindicating the Executive's views about the lawfulness of a standing order.  What the Executive cannot do is bring a facial challenge seeking "[a] Writ of Erasure" to "blot the standing order from the books."  *United States v. Zingsheim*, 384 F.3d 867, 870 (7th Cir. 2004).  The federal courts do not resolve interbranch disputes in the abstract (or at all if they can help it).  A suit captioned *Congress v. Executive* or vice-versa would be dismissed out of hand.  *Executive v. Judiciary* fares no better.

18

The Executive invokes "the national government['s]" long-recognized power to sue inferior entities. *In re Debs*, 158 U.S. 564, 581 (1895). But the Judiciary is not inferior to the Executive. This suit would be entirely unheard of in traditional equity practice and is thus unauthorized. *See Trump v. CASA*, 606 U.S. 831, 841 (2025). "[T]here was no such thing as an injunction against a judge" at "common law." *Pulliam*, 466 U.S. at 529. And, even assuming some equitable precursor could be stretched to cover branch-on-branch litigation, a legion of special factors would counsel hesitation in a context where the Executive plainly lacks any express cause of action. The idea that Congress would authorize this suit is a non-starter. Both Congress and the constitutional structure already give the Executive various other ways to accomplish its ends without resorting to branch-on-branch litigation. And the practical dangers of permitting sovereign-on-sovereign suits are self-evident.

The threshold difficulties with this lawsuit do not end there. Bedrock principles of sovereign immunity and judicial immunity preclude the Executive's action. And with respect to its request for injunctive relief in particular, the Executive does not even have standing, because it lacks not just a cause of action, but a legally cognizable injury or any means to redress it.

**II.** As this Court has already concluded, this litigation is not moot. The District Court heeded its institutional responsibility—and the best traditions of "reciprocal respect," *Abrego Garcia*, 2025 WL 1021113, at *8—by refining the

19

standing order.  The Executive's suggestion that this Court should interpret that action as an "admi[ssion] that [it] was right all along," Exec.Br.3, underscores why sovereign-on-sovereign litigation is so offensive to our constitutional structure (to say nothing of the public interest).  A regime in which an attempted accommodation of the interests of a coordinate branch is treated as an admission has nothing to recommend it.

In all events, unless and until the Executive concedes that the current standing order "destroy[s] the basis" for all of its claims, this case is not moot, and *Munsingwear* vacatur is manifestly inappropriate.  *Brusznicki v. Prince George's Cnty.*, 42 F.4th 413, 419 (4th Cir. 2022).  Not only does the Executive's opening brief stop conspicuously short of that line, but the Executive has elsewhere taken the exact opposite position, arguing that the amendments to the standing order change nothing, and putting both the District Court and this Court on notice that another extraordinarily disruptive suit will be promptly in the works if the District Court applies the standing order in ways the Executive dislikes.  That is neither mootness nor "reciprocal respect." *Abrego Garcia*, 2025 WL 1021113, at *8.  The need for a precedential resolution of this suit remains acute.

**III.**    The Executive's suit fares no better on the merits; it plainly fails to state a legally sufficient claim.  The Executive's INA claim fails because the Executive has concededly relied on other statutory schemes to detain and remove aliens, and

20

the Executive makes no argument that the standing order could not be validly applied to petitions filed by aliens facing removal under those provisions. The Executive's improper-equitable-relief claim fails too, because the standing order does no more (and no less) than "preserve the court's jurisdiction" to determine whether it has any jurisdiction to exercise. *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966). That makes it a paradigmatic administrative stay. Administrative stays frequently issue via local rule or standing order (especially in the context of immigration), and they are exceptionally important in the habeas context. They are also quintessentially unreviewable exercises of judicial discretion, as the Executive has conceded in other cases. This Court should not be the first to hold otherwise.

## ARGUMENT

### I.     This Lawsuit Fails At The Threshold.

#### A.     The Executive Is Not Empowered To Mount a Facial Attack on a Coordinate Branch of Government.

1. The caption of this lawsuit betrays the problem at its core. One branch suing an entire Judicial District *en masse*—and effectively forcing the district's judges to recuse and retain private counsel, while obligating the Chief Judge of this Court to take the burdensome step of finding a judge from another jurisdiction to be appointed by designation—is not a normal occurrence. Nor is it a lawful occurrence. Outside the confines of an appeal in an actual case or controversy in which it is a party, the Executive does not have the power to force one federal court to sit in

judgment of another federal court's exercise of core judicial functions. Congress certainly has never authorized that kind of branch-on-branch lawsuit. Indeed, that much is undisputed. And while the Executive elsewhere treats the absence of an express cause of action as fatal, *see, e.g.*, Br. for U.S. at 12-13, *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, No. 24-345, 2025 WL 2597327, at *12-13 (U.S. Sept. 3, 2025), here it dismissed it as a triviality. That does not work. This is the last context where anyone should dispense with the need for legislative imprimatur. Congress is "perfectly competent … to authorize the United States to be the guardian of th[e] public interest in a suit for injunctive relief." *United States v. Raines*, 362 U.S. 17, 27 (1960). And there are countless reasons to think that Congress would hesitate and then refrain entirely before authorizing such a disruptive branch-on-branch lawsuit.

The Executive instead claims that this suit is a permissible exercise of its power to bring an "equitable cause of action … to protect the federal government's interests." Exec.Br.20 (citing *Debs*, 158 U.S. 564). That assertion underscores the separation-of-powers anomaly at the heart of this lawsuit. Presumably, the Executive does not mean that the Judiciary should (or must) infer a judge-made cause of action to allow the Executive to sue the Judiciary. Instead, the Executive must think it possesses the inherent authority to bring such a lawsuit. But from where would that authority spring? The branch of our government authorized by the

22

Constitution to create causes of action is Congress, *see, e.g.*, *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and the Executive admits that Congress has not done anything to authorize this lawsuit. Moreover, at most, the Executive might possess some inherent authority to vindicate the sovereign interests of the United States against an inferior sovereign or private actor. The Supreme Court has only ever sanctioned resort to *Debs* for "lawsuit[s] brought by the sovereign United States of America"— the whole of it—"against a state, a state entity, or a private party when those inferior parties took actions that allegedly violated the Constitution or federal laws." JA200. The Executive may think that the Judiciary is its inferior, but the Constitution treats the branches as coordinate and co-equal.

The Executive's resort to *Debs* also fails on its own terms. *Debs* upheld an injunction against individuals obstructing the mails and rails only after first holding that the Executive had the authority to remove such obstructions unilaterally. 158 U.S. at 578-79. That is miles away from the situation here, where the Great Writ *prohibits* the exercise of wholly unilateral executive action, *see* U.S. Const. art. I, §9, cl. 2, and the Executive is trying to interfere with steps the Judiciary thinks necessary to protect its own constitutional prerogatives and the liberty of individuals. Zealously safeguarding the Great Writ is not an "injury" to the Executive or the United States, *contra* Exec.Br.34; it is part and parcel of both the Judicial and Executive oaths of office.

It is little wonder, then, that no prior Administration has ever sought to bring a suit that looks anything like this. That absence is hardly "immaterial," Exec.Br.33; it speaks volumes. After all, prior Administrations have had more than their fair share of frustrations with the Judiciary. The fact that no Executive save this one has ever sought to wield such a "highly attractive power" is a strong indication "that the power" does "not [] exist." *Dep't of Com. v. House of Representatives*, 525 U.S. 316, 348 (1999) (Scalia, J., concurring in part); *see also Learning Res., Inc. v. Trump*, 146 S.Ct. 628, 640-41 (2026) (plurality op.).

2. The Executive points to a handful of out-of-circuit cases involving pre-enforcement challenges to local rules. *See* Exec.Br.30 & n.5. But not one of those cases stretched *Debs* to cover "a controversy between equal[]" branches of the federal government. *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 423-25 (1925). Indeed, none of these cases even cites *Debs*.[4]

In addition to not invoking *Debs*, none of those suits was even brought in the name of the United States. Instead, the examples involving the federal government were brought by particular individuals to whom the challenged rule was specifically directed. *See, e.g.*, *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4 (1st Cir. 2000) (challenge to District of Massachusetts local rule, brought by the U.S.

---

[4] In the other cases the Executive invokes (at 33-34), the Executive had a statutory cause of action.

24

Attorney of that district, as well as a senior DOJ attorney barred in Massachusetts). Those officials thus could—and did—establish standing in their own names by submitting declarations alleging both "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" the rule and "a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). That, in turn, enabled those courts to consider the challenge not as an abstract battle between the branches, but in the context of a distinctly vexed official who intended to violate the rule at issue and brought a pre-enforcement challenge against the entity that would otherwise have been able to prosecute him for contempt. *Cf., e.g.*, *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 279 n.2 (2008) (§1983 plaintiff facing "credible threat of prosecution" can bring a pre-enforcement suit against District Attorney in his official capacity, notwithstanding prosecutorial immunity). Indeed, most of those cases did not even dwell on questions about justiciability and the existence of a cause of action because of the vastly different quality of the lawsuits.

Moreover, none of the cases the Executive invokes involved a standing order carrying out the core adjudicatory function of managing the court's docket. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). They instead all involved rules governing out-of-court activities. *See Whitehouse v. Dist. Ct. for the Dist. of R.I.*, 53 F.3d 1349, 1353 (1st Cir. 1995) (rule imposing certain prerequisites on subpoena

25

practice); *Carter v. Clark*, 616 F.2d 228, 229 (5th Cir. 1980) (suing clerk of court over affidavit formalities); *Russell v. Hug*, 275 F.3d 812, 815 (9th Cir. 2002) (rule governing who could join the indigent defense panel); *see also Thaw v. Lynch*, 2016 WL 1045527 (D. Ariz. 2016); *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. [NAAMJP] v. Roberts*, 180 F.Supp.3d 46 (D.D.C. 2015); *NAAMJP v. Holder*, 2015 WL 13158479 (D. Md. 2015) (all similar).

On top of that, all the Executive's appellate standing-order cases pre-date the Seventh Circuit's decision in *United States v. Zingsheim*, 384 F.3d 867. *Zingsheim* actually did involve a standing order that exercised a core adjudicatory function, and it expressly considered the proper way for the Executive to challenge such an order. As the court explained in rejecting the lawsuit before it, there is no "Writ of Erasure" to "blot the standing order from the books," let alone any equitable license for the Executive to sue an entire district court bench. *Id.* at 870. The Executive instead has two permissible options. First, it can treat the standing order as a local rule and file an administrative challenge with the circuit judicial council under 28 U.S.C. §2071. That administrative route obviates all the theoretical and practical problems of naming a United States District Court and all its judges as the defendants in an Article III lawsuit. Second, it can take a good-old-fashioned appeal in an individual case where the standing order was applied to the Executive's detriment. *Id.*

26

The Executive could and should have followed one of those paths here. A habeas petition is a classic case or controversy, and to the extent the Executive believes the standing order is *ultra vires*, there is no obstacle to the Executive challenging it in such a case. Or the Executive could have petitioned to have the standing order (to the extent it qualifies as a rule promulgated pursuant to delegated authority) "modified or abrogated by the judicial council." 28 U.S.C. §2071(c)(1). Either approach would have obviated the need to resort to extravagant theories about Executive standing, judicial immunity, or causes of action.

The Executive protests that "appeals of the Standing Order['s] entry in individual cases would face threshold barriers." Exec.Br.48. But it conspicuously does not explain exactly what it has in mind. The INA may strip district courts of jurisdiction to decide the merits of many immigration-related claims, but nothing deprives a court of "jurisdiction to determine its own jurisdiction." *Brownback v. King*, 592 U.S. 209, 218-19 (2021). And that, at its core, is what the standing order protects. Once a judge uses the interval the standing order affords it to make that initial determination, "Title 8's jurisdictional bars" pose no barrier to an appeal under the collateral-order doctrine. *Contra* Exec.Br.48. Furthermore, although the Executive invokes mootness concerns, Exec.Br.48, an appeal challenging the validity of a 48-hour respite would be the posterchild for the capable-of-repetition-yet-evading-review exception to mootness. *See Lancaster v. Sec'y of Navy*, 109

27

F.4th 283, 290-91 (4th Cir. 2024); *In re Capitol Broad. Co.*, 19 F.4th 385, 394 (4th Cir. 2021). In fact, one need not look beyond the Fourth Circuit to find a challenge to a local rule that was not just possible, but successful. *See McCargo v. Hedrick*, 545 F.2d 393, 402 (4th Cir. 1976).[5]

3. Even if (contrary to fact) some equitable forebear for this suit could be identified, every factor in the book would counsel against allowing the suit to proceed. *See Ziglar v. Abbasi*, 582 U.S. 120, 136 (2017) (courts must consider whether "special factors counsel[] hesitation" before extending a nonstatutory cause of action to a new context). "[T]he risk of interfering with the authority of the other branches" could not be more profound. *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020). "Congress already has provided … alternative remedial structure[s]," in the form of a run-of-the-mill interlocutory appeal, a petition to the Fourth Circuit judicial council under 28 U.S.C. §2071, or even mandamus. *Cf. Egbert*, 596 U.S. at 493 (noting

---

[5] The Executive obliquely cites *Virginia v. Tenneco, Inc.*, 538 F.2d 1029 (4th Cir. 1976), *see* Exec.Br.48, but that decision undermines its argument. *Tenneco* acknowledges that while TROs are "ordinarily" (but not always) unreviewable, appellate courts *can* review them—but any request for review is generally a losing proposition *on the merits*, except for the rare TRO that "bespeaks of the nature of a preliminary injunction." *Id.* at 1029-30; *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (per curiam) ("[W]hen a grant or denial of a TRO might have a serious, perhaps irreparable, consequence, and can be effectually challenged only by immediate appeal, we may exercise appellate jurisdiction."). That the Executive may face barriers to prevailing on appeal does not mean it faces barriers to bringing one.

28

reasons to hesitate even if "existing remedies do not provide complete relief"). And, of course, Congress is "perfectly competent" to authorize additional relief if it wants, *Raines*, 362 U.S. at 27—though "reasons to think Congress might doubt" the wisdom of sovereign-on-sovereign litigation abound, *Hernandez*, 589 U.S. at 102.

The Executive scoffs that "[t]he judiciary would hardly be debased or disempowered" by facing the prospect of being sued by the Executive. Exec.Br.34. But a branch-on-branch action is no small thing. If the roles were reversed, and the Judiciary tried to haul the Executive before the Judiciary absent any ordinary case or controversy, the Executive would be the first to cry foul. And rightly so, as the Judiciary could not fairly adjudicate a case in which the court itself was the plaintiff. But the fundamental problem is not eliminated when the shoe is on the other foot and the Judiciary is a defendant. The Executive itself recognized the problem by seeking the recusal of the entire District Court. But that felt need to seek recusal is a symptom of the constitutional problem, not a cure, especially because nothing in the Executive's theory would prevent it from suing this Court or the Supreme Court.

At a more practical level, there is no discounting the practical interference with a coordinate branch caused by this suit. Responding to litigation "cause[s] a deflection of … energies," "result[ing] in a severe interference with the administration of an important public office" all the same. *Rehberg v. Paulk*, 566 U.S. 356, 365 (2012). That aptly describes the experience of the District Court over

the past year:  The District Court had to find and retain private, non-conflicted counsel, discuss strategy, and review draft litigation filings in multiple courts.  And all that just for the pleadings stage; the burdens the District Court would face if this case entered discovery would increase by orders of magnitude.  Even if a federal court "were ultimately not found liable" to the Executive Branch, "the possibility of an extended proceeding alone may render" other judges "'unduly cautious in the discharge of [their] official duties.'"  *Trump v. United States*, 603 U.S. 593, 636 (2024).

*     *     *

This extraordinary facial challenge was not remotely necessary.  That said, the primary vice of this lawsuit is not that it was unnecessary, but that it is impermissible.  It is an effort by one branch in its institutional capacity to sue another branch in its institutional capacity, seeking what amounts to an advisory opinion unmoored from any specific case or controversy.  Courts that have confronted comparable efforts by legislators to sue in their official capacity have routinely rejected them on nonjusticiability grounds, *see, e.g.*, *Raines v. Byrd*, 521 U.S. 811 (1997), and instead required such challenges to be pressed through ordinary private cases and controversies, *see, e.g.*, *Clinton v. City of New York*, 524 U.S. 417 (1998).  The same principles apply here.  While the Executive enjoys the distinct power to sue in the name of the United States to enforce federal laws and ensure that they are faithfully

30

executed, it does not enjoy any free-floating authority to sue a coordinate branch of government. Simply put, there is nothing "proper" about "a challenge like this one." *Contra* Exec.Br.30.

**B.    Defendants Are Immune From Suit.**

Even if the Executive had the power to hale the Judiciary into federal court, Judge Cullen correctly concluded that all Defendants would be immune from the claims the Executive presses.

1. Though it named the United States District Court for the District of Maryland as a defendant in this action, the Executive no longer disputes that "the District of Maryland as an entity" enjoys "*sovereign* immunity." Exec.Br.35 n.6; *see* JA188. Nor could it, as it is axiomatic not only that "the United States may not be sued without its consent and that the existence of" an express statutory waiver of sovereign immunity "is a prerequisite for jurisdiction," *United States v. Mitchell*, 463 U.S. 206, 212 (1983), but also that this immunity extends over "U.S. District Courts," *Atchison v. U.S. Dist. Cts.*, 190 F.Supp.3d 78, 89 (D.D.C. 2019). The fact that the District Court concededly enjoys the sovereign immunity of the United States underscores the broader problem with this lawsuit: The Executive has quite literally sued itself. But it independently requires the dismissal of the District Court on sovereign immunity grounds.

31

2. The Executive challenges only Judge Cullen's holding that the judges it sued, and by extension the clerk of court, enjoy *judicial* immunity.[6]  The Executive makes two arguments why it believes "[j]udicial immunity does not apply in [this] case[]." Exec.Br.35.  Judge Cullen correctly rejected both of them.  JA189-98.

First, the Executive contends that judicial immunity does not apply here "because the challenged act is a district-wide local rule," and " promulgating district-wide standing orders and local rules … is not a 'function[]' traditionally protected by judicial immunity." Exec.Br.35-36.  As Judge Cullen explained, that is incorrect. *See* JA196.[7]

Under Supreme Court and Fourth Circuit precedent, what matters is whether the challenged action was "taken in the judge's judicial capacity." *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam); *see also, e.g.*, *Gibson*, 85 F.4th at 223.  That is

---

[6] The Executive does not dispute Judge Cullen's conclusion that, if "the defendant judges are entitled to judicial immunity," then "the defendant Clerk of Court, whose only alleged sin is implementing the standing orders, is protected under the same doctrine." JA197.

[7] The Executive's "rulemaking" argument is also self-defeating.  As explained, "[a] rule of a district court prescribed under" the rulemaking power delegated by Congress "shall remain in effect unless modified or abrogated by the judicial council of the relevant circuit." 28 U.S.C. §2071(c)(1).  That provision does not prevent a district judge from refusing to apply a rule in a particular case on the ground that the rule is *ultra vires*; nor does it prevent this Court from invalidating the rule on appeal. It does, however, prevent a district court from hearing a facial challenge to a rule or ordering vacatur of the rule as a remedy. *See Zingsheim*, 384 F.3d at 870; *supra* p.26. Yet that is exactly what the Executive seeks here.

32

plainly the case here. "[I]ncidental to the power inherent in every court" is the power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254; *accord Majerska v. United States*, 2021 WL 4739602, at *3 (D.N.J. 2021); *Cabrera v. United States*, 2021 WL 4311255, at *3 (S.D.N.Y. 2021); *see* JA197. That is exactly what the standing order does. And controlling the disposition of cases on the court's docket remains "a function normally performed by a judge," *Gibson*, 85 F.4th at 224-25, regardless of whether it is performed in a specific case alone or through the combination of a standing order and its entry in the case it governs. Indeed, the Executive implicitly recognized as much by seeking not just to invalidate the standing order, but to enjoin every judge in the District from entering it *in any particular case*.

The Executive tries to resist that conclusion by pointing to *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), and positing that *Jackson* crafted a "gloss" on judicial immunity that permits injunctions to "prevent [a] judge from enforcing a rule of her own creation." Exec.Br.35 (quoting *Jackson*, 595 U.S. at 42). The Executive is mistaken. *Jackson* mentioned "judicial immunity" only once—to explain why the case "had nothing to do with [it]," since *Jackson* involved a clerk of court following state *statutory* law, not a clerk implementing (let alone a judge

33

promulgating) a *judicial* order.  595 U.S. at 42.  *Jackson* quite literally distinguishes itself and provides the Executive no support.

Second, the Executive takes issue with Judge Cullen's holding that the Supreme Court's decision in "*Pulliam* does not extend to limit judicial immunity for federal judges" in cases seeking injunctive relief, JA194.  *See* Exec.Br.37-43.  But court after court has held that *Pulliam* did not disturb the rule that "federal judges possess absolute judicial immunity from liability" not just "for monetary damages," but "for injunctive relief for their judicial duties" as well.  *Akinro v. Blake*, 2007 WL 3020186, at \*1 (D. Md. 2007), *aff'd*, 235 F.App'x 75 (4th Cir. 2007) (per curiam); *accord, e.g.*, *Newsome v. Merz*, 17 F.App'x 343, 345 (6th Cir. 2001); *Bolin v. Story*, 225 F.3d 1234, 1240-42 (11th Cir. 2000).

For good reason.  To be sure, *Pulliam* held that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity" in suits against state-court judges brought under 42 U.S.C. §1983.  466 U.S. at 541-42.  But federal district judges are not state-court judges, and there is no federal-officer analog to §1983.  The Executive claims that "*Pulliam*'s express holding" was not "limited to suits against *state* judges."  Exec.Br.37.  But "[t]hat reading of *Pulliam* is wrong."  Exec.Br.37.  As Judge Cullen explained, the only reason the *Pulliam* Court even "could address the underlying judicial-immunity question in the first place" was that the case "involved whether one could seek

34

attorney's fees from a state judge under §1988 after a successful §1983 lawsuit." JA191; *see Pulliam*, 466 U.S. at 528 n.5.

Furthermore, *Pulliam* drew on history that recognized the authority of a superior tribunal (the King's Bench) to rein in collateral attacks by inferior tribunals. *See Pulliam*, 466 U.S. at 529-36. Indeed, the whole point of that discussion in the majority opinion in *Pulliam* was to distinguish between a permissible effort by a superior court (like the King's Bench across the pond, or a federal court here) to enjoin an inferior court (like ecclesiastical courts there, or state courts here) and an impermissible effort by members of the same court to enjoin one another. (The four dissenters favored judicial immunity from both. *See id.* at 549 (Powell, J., dissenting).) As Judge Cullen explained, that history supports the authority of federal courts to issue injunctions against state-court judges in §1983 suits. *See* JA191-93. But the federal Judiciary is not inferior to the federal Judiciary. History thus does not support the extraordinary injunction against an entire federal Judicial District that the Executive has sought in lieu of challenging the application of a standing order via an ordinary appeal.

The Executive asserts that "*Pulliam* discredited a comparison between the King's Bench and federal district courts." Exec.Br.39. In fact, *Pulliam* noted only that "[t]he relationship between the King's Bench and its collateral and inferior courts is not precisely paralleled in our system by the relationship between *the state*

35

and federal courts." *Pulliam*, 466 U.S. at 535 (emphasis added). Indeed—which is why that history does not foreclose injunctions against *state-court* judges even though it forecloses them against federal-court judges.

The Executive fares no better with its resort to a case that predates *Pulliam*, namely, *Butz v. Economou*, 438 U.S. 478 (1978). *See* Exec.Br.40-41. As Judge Cullen carefully explained, "the Supreme Court's general admonition not to impart different levels of immunity to state and federal officials for the same constitutional violation in *Butz*" does not move the needle. JA195. "The reasoning of *Pulliam* simply is inapplicable" to a suit against federal judges. *Mullis v. U.S. Bankr. Ct. for Dist. of Nevada*, 828 F.2d 1385, 1394 (9th Cir. 1987).

In all events, *Pulliam* went out of its way to emphasize that, even where judicial immunity does not apply, an injunction against a judge could issue only upon "a showing of an inadequate remedy at law." *Pulliam*, 466 U.S. at 537. And, here, the Executive has the classic remedy of law: an appeal. For all these reasons, Judge Cullen correctly held that the judges and clerk of court have immunity from this suit.

## C.     The Executive Lacks Standing to Seek Injunctive Relief Against the Judiciary.

It is hornbook law that "[p]laintiffs bear the burden of establishing standing" for every form of relief they seek. *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181 (4th Cir. 2013). And standing requires both injury in fact and redressability—which, in turn, requires "that the

36

court has the power to grant the plaintiff's requested relief." *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025). "[I]f the court is 'powerless to provide the very relief' the plaintiff requests," then "[a]n injury is not redressable." *Id.* As Judge Cullen correctly concluded, that is the case here. Not only does the Executive not have the kind of non-institutional injury necessary for Article III injury in fact, *see supra* pp.22-23, 30-31; *accord Raines*, 521 U.S. at 818-19, 829, but the Supreme Court has squarely held that the Judiciary Act's grant of authority to issue equitable relief "encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception," *CASA*, 606 U.S. at 841. And there is no history of either the High Court of Chancery or colonial-era (or any other) courts on this side of the Atlantic issuing injunctions against judges.

The Executive does not contend otherwise. It instead tries to rewrite Judge Cullen's decision. That is a needless effort, as standing is jurisdictional, and standing determinations are reviewed *de novo*. But the Executive misunderstands Judge Cullen's standing holding. Judge Cullen did not hold that the Executive lacks standing because, though the requested relief is available in theory, mootness or some merits defense makes it unavailable in practice. *Contra* Exec.Br.44-46. That *would* be "confus[ing]" the merits with standing, Exec.Br.44-45—but Judge Cullen made no such mistake. Judge Cullen instead concluded that neither he nor any other

37

federal judge has the power to issue the injunctive relief the Executive seeks here at all.

As Judge Cullen explained, "there was no such thing as an injunction against a judge" at the Founding. JA186 (citing *Pulliam*, 466 U.S. at 529 (majority op.), and *id.* at 549 (Powell, J., dissenting)). The Executive does not dispute that, presumably because it is indisputable. Indeed, the history is so clear that the District Court would prevail even if *it* bore the burden to show that the Executive's requested relief fell outside historical equitable traditions. Our constitutional system has never allowed "[o]ne judge of a district court" to "rule directly on the legality of another district judge's judicial acts," let alone to police those acts on pain of contempt. *Gessele v. Jack in the Box Inc.*, --- F.4th ----, 2026 WL 1075915, at *9 (9th Cir. 2026) (quoting *In re McBryde*, 117 F.3d 208, 225 n.11 (5th Cir. 1997)); *see also Bolin*, 225 F.3d at 1240 ("[T]o allow injunctive relief against federal judges would be to permit a 'horizontal appeal' from one district court to another or even 'reverse review' of a ruling of the court of appeals by a district court."). When the only relief that would provide redress has never been available to Article III courts, there is no redressability and no Article III standing. *See, e.g.*, *United States v. Robinson*, 159 F.4th 277, 279 (4th Cir. 2025). Any one of these justiciability problems would be fatal. Collectively, they underscore that this is a lawsuit that should have never been filed.

## II.    This Case Is Not Moot.

The Executive renews its request for vacatur on mootness grounds. Exec.Br.26-29.   But the motions panel already rejected that argument, correctly concluding that this "case is not moot."   CA4.Dkt.24 at 2.   That decision was eminently correct, and the Executive offers no valid basis to revisit it.

When a challenged rule is amended while a lawsuit is pending, litigation seeking to set aside the rule does not automatically become moot just because not every jot and tittle of the challenged rule remains in place.   *Contra* Exec.Br.27. When the revised rule "continues to" allegedly "abridge plaintiffs' rights" in the same way, "litigation may press on."   *Brusznicki*, 42 F.4th at 419.   That is exactly the situation here.

The Executive's complaint raised three claims:   whether the standing order impermissibly grants equitable relief without considering the traditional equitable factors, JA15-18 (Count I); whether the standing order exceeds the District Court's INA "jurisdiction and authority," JA18-19 (Count II); and whether the standing order violates 28 U.S.C. §2071's notice-and-comment requirement for district court local rules, JA20 (Count III).   It appears to be common ground that the amendments to the standing order "destroyed the basis" for the Executive's notice-and-comment claim. *Brusznicki*, 42 F.4th at 419; *see* Exec.Br.16, 59.   But the Executive has conspicuously declined to say that they destroyed the basis for its other two claims.   *Cf.* Exec.Br.4

39

(asserting that the new version "cur[ed] the [alleged] procedural flaws in the original Standing Order," but merely "*attempt*[*ed*] to address" the other alleged flaws (emphasis added)).

To the contrary, the Executive has publicly stated that, from its perspective, those amendments change nothing, and that the operative version of the standing order continues to "usurp[] Executive Branch authority and flout[] congressional intent." CA4.Dkt.22-2 at 2. For good measure, the Executive unabashedly warned that it "will not hesitate to" bring a materially identical "pre-enforcement challenge" to the amended order should it at some point see fit to do so. CA4.Dkt.19-1 at 9 n.6. Even now, though the Executive suggests that the operative order "issue[s] a different kind of relief in different circumstances" and gestures towards the new decretal language and the different certifications, Exec.Br.27-28, it conspicuously does not concede that those alterations render it compliant with equitable principles or the INA. Quite the opposite: The Executive has elsewhere said that the certifications change nothing beyond perhaps somehow exacerbating the problems it (mis)perceives. CA4.Dkt.22-2 at 3.

This case is thus as far from *New York State Rifle & Pistol Association v. City of New York*, 590 U.S. 336 (2020) (per curiam), and as close to *Brusznicki*, as it gets. The amendments in *New York State Rifle & Pistol Association* sent the plaintiffs back to the drawing board: Mounting a challenge to the revised statute would have

40

required them either to develop a new legal theory, supported by entirely different facts "that w[ere] understandably not asserted previously," or to seek an entirely different form of relief that might raise distinct threshold issues. 590 U.S. at 339. The amendment in *Brusznicki*, by contrast, did not "destroy[] the basis for Plaintiffs' claims," so this Court simply applied those claims to the operative statute. 42 F.4th at 418-19. Here, too, while there may be "no indication that" the District Court "will return to" the prior versions of the standing order, Exec.Br.26, there remains a very real "indication that" the Executive "will return to" court with the exact same claims, as the Executive thinks that the amended order suffers from all the same problems as the previous versions. And, for mootness purposes, that is all that matters.[8]

## III.    The Executive's Merits Arguments Are Meritless.

Judge Cullen correctly determined that the Executive's case fails at the threshold. *See supra* Part I. There is no reason to go further. But if this Court reaches the Executive's merits arguments, it should take the standing order "as it now stands," *Brusznicki*, 42 F.4th at 418, and reject them, because the two counts

---

[8] Because this case is not moot, the Executive's request for *Munsingwear* vacatur is misplaced. But even if the case were moot, *Munsingwear* vacatur would be manifestly inappropriate, as all it would accomplish is to force the parties to rehash the same justiciability questions whenever the Executive chooses to bring its next extraordinarily disruptive facial challenge to the District Court's standing order. *See* CA4.Dkt.22-1 at 5-8.

41

that remain fail as a matter of law. *See supra* pp.39-40 (explaining that the operative version moots Count III).

### A.      The Standing Order Is Not Facially *Ultra Vires*.

Count II is readily dispatched. The Executive argues that the standing order is facially unlawful because of the INA's strict limits on district-court jurisdiction. But the Executive concedes that the INA leaves district courts with some jurisdiction to consider habeas petitions from aliens facing INA removal. *See* Exec.Br.57 (citing *Thuraissigiam*, 591 U.S. at 111); *cf., e.g.*, 1st Cir. L. R. 18.0 (directing clerk to "enter an administrative order staying removal for ten business days" *both* in "petitions for review" of BIA orders *and* in "appeals from district court habeas proceedings"). Nor does the Executive dispute that it has recently relied on statutes other than the INA to detain and remove aliens, and that the standing order could be lawfully applied to petitions filed by those aliens even if the INA posed a jurisdictional bar. *See, e.g.*, *supra* pp.7-8 (citing *J.G.G.*, 604 U.S. at 672-73). That suffices to defeat its claim that the INA renders the standing order facially *ultra vires*. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). And to the extent the Executive is concerned that the District Court might exceed the bounds of its INA authority in particular cases, it can always appeal if and when the standing order is applied to an INA petitioner in a way that the Executive considers to be unlawful.

**B.**  **The Standing Order Does Not Impermissibly Award Equitable Relief.**

Count I fares no better.  The Executive argues that federal courts cannot fashion any "form of" relief that is granted "upon the mere filing of" a motion without a full-blown consideration of the "traditional" equitable factors.  Exec.Br.25, 52, 55.  That sweeping contention would imperil not just the standing order, but this Court's Standing Order 19-01, and every other order like it.  *See supra* pp.5-7.

As all of those orders reflect, far from fashioning some novel form of interim equitable relief, the standing order is a paradigmatic example of a federal court exercising its inherent authority to enter a brief administrative stay that affords itself time to assess its jurisdiction.  *See, e.g.*, *United States v. Shipp*, 203 U.S. 563, 573 (1906) ("Until its judgment declining jurisdiction should be announced, [a court] ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition."); *Belbacha v. Bush*, 520 F.3d 452, 455-46 (D.C. Cir. 2008) (similar under 28 U.S.C. §1651).  Faulting the standing order for permitting relief without a full-blown four-factor analysis thus misses the point:  Administrative stays are not designed to "reflect the court's consideration of the merits"; they are "exercise[s] of" trans-substantive "docket-management authority," designed to "buy[] the court time to" *consider* whether it can and should grant relief on the merits.  *Texas*, 144 S.Ct. at 798 (Barrett, J., concurring) (emphasis added);

43

*Nat'l Council of Nonprofits v. OMB*, 763 F.Supp.3d 13, 17 (D.D.C. 2025) (collecting examples of administrative stays entered by district courts).

As explained at the outset, *see supra* pp.5-7, administrative stays are especially prevalent in this context.[9] And in "deportation" cases in particular, they have long been "impos[ed] … automatic[ally]" by operation of "court rules," "with no need for judges to consider each case individually." Rachel Bayefsky, *Administrative Stays: Power and Procedure*, 97 Notre Dame L. Rev. 1941, 1958-59, 1973-74 (2022) (collecting examples). That is because deportation is the paradigmatic context where exceptionally fast-paced circumstances might divest the court of jurisdiction before it can even exercise its inherent "jurisdiction to determine

---

[9] *See also, e.g.*, *M.S.P.C. v. CBP*, 60 F.Supp.3d 1156, 1160 (D.N.M. 2014) ("At the hearing, the Government conceded that this Court has jurisdiction to issue a stay of removal while it considers its own jurisdiction."); *Alam v. Nielsen*, 312 F.Supp.3d 574, 577 (S.D. Tex. 2018) ("In recognition of the jurisdictional question's complexity, the Court has thus far stayed the removal of Alam."); *Vijender v. Wolf*, 2020 WL 1935556, at *1 (D.D.C. 2020) (granting "temporary stay of removal" to obtain "expedited briefing regarding the court's jurisdiction over the matter"); *S.L.V. v. Rosen*, 2021 WL 243442, at *7 (W.D. Tex. 2021) (holding that, in immigration cases, a district court is "well within its purview to issue [an] administrative stay to maintain the status quo until it c[an] determine the facts and law necessary to resolve the jurisdictional questions" and collecting examples); *Gonzalez-Pablo v. Mason*, 788 F.Supp.3d 759, 761 (S.D. W. Va. 2025) (ordering parties "to (1) maintain the status quo, (2) not remove the Petitioner from the jurisdiction, [and] (3) locate the Petitioner" because the district court's habeas "jurisdiction was unclear").

its own jurisdiction." *Appalachian Voices v. U.S. Dep't of the Interior*, 78 F.4th 71, 76 (4th Cir. 2023).[10]

The standing order comfortably fits that mold. It seeks only "to preserve … the potential jurisdiction of this Court over pending matters while the Court determines the scope of its authority to grant the request[ed] relief[,] to ensure Petitioners are able to participate in the adjudication of their requests for habeas relief[,] … and to ensure the Government has a fulsome opportunity to brief and present arguments in its defense." JA64. To that end, it temporarily suspends any authority the Executive might otherwise have to remove the petitioner for roughly 48 hours. *See* Second Amended Standing Ord. 2025-01, *supra*, at 2. The standing order does not purport to resolve or even foreshadow the merits of any petition, and the temporary stay it imposes is not tethered to the resolution of any further proceedings; it expires by its own terms at "4:00 p.m. on the second business day following the filing of the Petition" unless the presiding judge affirmatively extends or shortens it. JA65. That is a classic exercise of federal courts' inherent "power … to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions." *In re McDonald*, 489 U.S. 180, 184 n.8 (1989) (per curiam).

---

[10] The undisputed existence of that jurisdiction is yet another reason the Executive's INA argument fails, as a federal court has "jurisdiction to determine its own jurisdiction" even when "a statute … purports to strip jurisdiction." *Appalachian Voices*, 78 F.4th at 76.

45

Indeed, the standing order passes with flying colors a leading commentator's suggestion that courts should "set[] a presumptive time limit for these stays (say, *five business days*), subject to alteration if a particular motion … requires especially intensive deliberation." Bayefsky, *supra*, at 1972-73 (emphasis added).

In reality, it is the Executive that asks this Court to break the mold by becoming the first federal court in history to reject another federal court's criteria for granting an administrative stay. One of the only other times someone challenged a district court's authority to enter a purely administrative stay, the district court deemed that challenge "frivolous," *Dellinger v. Bessent*, 766 F.Supp.3d 57, 60 n.1 (D.D.C. 2025), and the D.C. Circuit summarily dismissed "for lack of jurisdiction," 2025 WL 561425, at *1 (D.C. Cir. 2025); *see also Texas*, 144 S.Ct. at 799 (Barrett, J.) (noting that neither the Supreme Court nor any other court "has []ever reviewed" another court's discretionary decision to enter an administrative stay). Absent a stay so "intrusive" and "long" that it "operates as a preliminary injunction," a court's authority to briefly maintain the status quo long enough to enable it to perform its constitutional function is inviolable. *Dellinger*, 2025 WL 561425, at *2 (Katsas, J., concurring). The Executive has conceded as much when that suited its prerogatives. *See, e.g.*, Emergency Mot. for Stay Pending Appeal at 18-20, *Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 11, 2025). And, of course, the Executive itself frequently requests and enjoys the benefits of administrative stays.

46

Wherever that outer limit on administrative stays might lie, it cannot seriously be argued that a junior-varsity version of Standing Order 19-01 that imposes an administrative stay lasting less than two business days is the "functional equivalent" of a preliminary injunction—especially when this Court has for years imposed its automatic 14-day administrative stay without objection. *Cf.* Reply in Supp. of Emergency Mot. for a Stay Pending Appeal at 2, *Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 12, 2025). If anything, that the administrative stays authorized by the standing order are so ephemeral "cuts strongly against" second-guessing it. *Dellinger*, 2025 WL 561425, at \*2 (Katsas, J., concurring). Proving the point, TROs (and Fourth Circuit Standing Order 19-01) last up to 14 days, *see* Fed. R. Civ. P. 65(b)(2), yet are *prima facie* unreviewable. *See supra* note 5.

A final point merits emphasis. The need for administrative stays is inherent in a judicial system that can act only when it has jurisdiction but is often asked to act when time is of the essence, or in the face of an event that could render effective judicial relief infeasible. But nowhere is the need for administrative stays more acute than in the context of "the Great Writ of habeas corpus." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). The nature of habeas, and its limits, means that the petitioner is subject to the Executive's total control—and, absent judicial intervention, can be spirited out of the court's reach at a moment's notice. In that circumstance, a brief interval to docket a petition and determine whether relief is available and necessary

47

is not a convenience; it is a critical component of preserving "one of the precious heritages of Anglo-American civilization." *Fay v. Noia*, 372 U.S. 391, 441 (1963). The Executive's contrary position is a thinly veiled attack on that "right of first importance." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008). And it is just one more way in which this litigation seeks to devalue the judicial role.

*    *    *

The Executive intones throughout its brief that "[t]he proper way to pursue a legal objection to a categorical court rule is through a challenge like this one." Exec.Br.30; *see also, e.g.*, Exec.Br.1, 51. Judge Cullen was not persuaded, and this Court should not be either. "Much as the Executive fights the characterization, a lawsuit by the executive branch of government against the judicial branch for the exercise of judicial power is not ordinary." JA209. If it were allowed to become so, the consequences would be shattering. The Executive would have this Court hearken a brave new world in which a district judge from one court can stand over the shoulder of (an)other district court(s) and assess whether the orders and opinions coming out of the latter's chambers comply with his or her directives. And nothing would stop the Executive from running the same playbook against an entire court of appeals, or even the Supreme Court. A regime in which federal judges (or Justices) must work under the constant specter of contempt, with concomitant need for

48

constant consultations with private counsel about injunction compliance, is as practically unworkable as it is constitutionally untenable.

And that is all at the *preliminary* stage. If this case were to go forward, the next step would be discovery, with Article III judges and principal Executive Branch officers "prob[ing]" each others' "mental processes," producing documents, and litigating privilege disputes of epic proportions. *United States v. Morgan*, 313 U.S. 409, 422 (1941). Then comes final judgment and the potential for a permanent injunction, the effect of which could be to place the United States District Court for the District of Maryland in indefinite judicial receivership of an out-of-district colleague. And the virus would only spread. If this suit succeeds, what was unprecedented will become commonplace. To be clear, the Executive need not win all (or any) of these battles; merely allowing such cases to proceed past the threshold would transform the separation of powers. The winner would be the Executive, which would have managed to permanently elevate itself over its coordinate branches. The loser would be not just or even principally the Judiciary, but the Constitution and the People it protects.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendants-Appellees*

April 29, 2026

50

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellees believe oral argument would assist the Court in deciding the critical issues presented by this appeal.

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)'s type-volume limitation because, according to Microsoft Word for Microsoft 365's word-count function, the brief contains 12,152 words, excluding the parts that Federal Rule of Appellate Procedure 32(f) exempts from the word count.

2. This brief complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirement and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirement because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman Font.

April 29, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

On April 29, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that the CM/ECF system will accomplish service.

<u>s/Paul D. Clement</u>
Paul D. Clement