No. 25-2004

# In the United States Court of Appeals for the Fourth Circuit

---

UNITED STATES, et al.,
*Plaintiffs-Appellants,*

*v.*

JUDGE MATTHEW JAMES MADDOX, et al.,
*Defendants-Appellees.*

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND, NO. 1:25-CV-2029*

---

**BRIEF OF AMICI CURIAE RETIRED FEDERAL JUDGES IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

PETER J. KAHN
LISA S. BLATT
MATTHEW B. NICHOLSON
JAMES N. SASSO
ERIN M. SIELAFF
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ...................................................................1

INTRODUCTION ..........................................................................................1

BACKGROUND .............................................................................................5

ARGUMENT .................................................................................................9

I.      Administrative Stays Are a Standard Tool for Federal Courts to Preserve Their Jurisdiction ..................................................................11

II.      The District of Maryland's Standing Orders Fit within this Inherent Authority and Follow Accepted Practice ...............................17

III.     The Government's Threatened Challenge of the Standing Order Endangers the Separation of Powers ......................................................20

     A. If Successful, the Government Could Evade Judicial Review of Its Actions ...........................................................................................21

     B. Permitting This Lawsuit to Continue Would Create Unnecessary Friction Between Two Coequal Branches ..............................................24

IV.     The Government's Lawsuit Creates Myriad Practical Problems .........26

CONCLUSION ............................................................................................28

i

# TABLE OF AUTHORITIES

Page

## CASES

*Afr. Cmties. Together v. Noem,*
2025 WL 3759533 (D. Mass. Dec. 30, 2025)................................................15

*Al Otro Lado v. Wolf,* 945 F.3d 1223 (9th Cir. 2019).......................................15

*Arnold v. Garlock, Inc.,* 278 F.3d 426 (5th Cir. 2001)......................................15

*Barton v. Apartment Inv. & Mgmt. Co.,*
2007 WL 9782574 (D. Md. Dec. 19, 2007)................................................16

*Bradley v. Fisher,* 80 U.S. (13 Wall) 335 (1871) ............................................26

*Brady v. NFL,* 638 F.3d 1004 (8th Cir. 2011) ................................................15

*Cheney v. U.S. Dist. Ct.,* 542 U.S. 367 (2004)................................................25

*Chilel-Chilel v. Bondi,* 2026 WL 962462 (9th Cir. Apr. 9, 2026).......................15

*Cobell v. Norton,* 2004 WL 603456 (D.C. Cir. Mar. 24, 2004) ..........................15

*Dep't of Com. v. New York,* 588 U.S. 752 (2019)............................................25

*Dep't of State v. AIDS Vaccine Adv. Coal.,* 145 S. Ct. 753 (2025) ....................15

*Dietz v. Bouldin,* 579 U.S. 40 (2016) ...........................................................14

*Does 1-26 v. Musk,* 2025 WL 910413 (4th Cir. Mar. 25, 2025) .........................15

*FTC v. Dean Foods Co.,* 384 U.S. 597 (1966) ...................................................6

*Gallusz v. LLP Mortg., Inc.,* 2025 WL 1360771 (S.D. Cal. Apr. 15, 2025) ......15

*Harris v. Nelson,* 394 U.S. 286 (1969) .........................................................21

*Henry J. v. Green,* 2019 WL 13319444 (D.N.J. Jan. 29, 2019)..........................16

*In Furtherance of the Stay of Certain Civ. Cases Pending the*
*Restoration of Dep't of Just. Funding,*
2025 WL 2958755 (S.D.N.Y. Oct. 17, 2025)..............................................16

*In re Abbott,* 800 F. App'x 296 (5th Cir. 2020)........................................14, 15

*In re Grand Jury Procs. Subpoena to Testify to Wine,*
841 F.2d 230 (8th Cir. 1988)..................................................................15

*In re Immigr. Petitions for Rev. Pending in the U.S. Ct. of Appeals for*
*the Second Cir.,* 702 F.3d 160 (2d Cir. 2012)...........................................20

*In re MCP No. 185,* 2024 WL 3491226 (6th Cir. July 12, 2024)........................13

*In re Trump,* 2025 WL 3623076 (D.C. Cir. Dec. 12, 2025) ...............................15

*June Med. Servs., LLC v. Gee,* 139 S. Ct. 661 (2019)......................................15

*Klay v. United Healthgroup, Inc.,* 376 F.3d 1092 (11th Cir. 2004)....................12

*Landis v. N. Am. Co.,* 299 U.S. 248 (1936)....................................................14

Cases—continued:

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)......................................................................23
*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
  395 F. App'x 701 (Fed. Cir. 2010) ...............................................15
*Middle E. Broad. Networks, Inc. v. United States*,
  2025 WL 1378735 (D.C. Cir. May 7, 2025) (en banc) ..................15
*Murthy v. Missouri*, 2023 WL 6763585 (U.S. Oct. 13, 2023) ..........15
*Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13 (D.D.C. 2025)...12, 15
*Nken v. Holder*, 556 U.S. 418 (2009)..............................................13
*Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025)............................22
*Noem v. Abrego Garcia*, 2025 WL 1022673 (U.S. Apr. 7, 2025) .................15, 24
*Oracle Int'l Corp. v. Rimini St., Inc.*,
  2023 WL 5221947 (D. Nev. Aug. 15, 2023) ...............................15
*Oregon v. Trump*, 154 F.4th 1161 (9th Cir. 2025) ..........................13
*Planned Parenthood Monte Mar, Inc. v. Ford*,
  2025 WL 1210968 (D. Nev. Apr. 25, 2025) ................................15
*Procup v. Strickland*, 792 F.2d 1069 (11th Cir. 1986) (en banc)......................12
*Rodriguez v. Berryhill*, 2019 WL 7403978 (S.D.N.Y. Jan. 22, 2019) ...............16
*Rollins v. R.I. State Council of Churches*, 146 S. Ct. 402 (2025).......................15
*Texas v. U.S. DHS*, 2024 WL 5454617 (E.D. Tex. Aug. 26, 2024)..............12, 15
*Trump v. J.G.G.*, 604 U.S. 670 (2025) ..............................................21
*Trump v. Vance*, 2019 WL 5703884 (2d Cir. Oct. 7, 2019)................................15
*Twelve John Does v. District of Columbia*,
  841 F.2d 1133 (D.C. Cir. 1988).................................................15
*U.S. Doge Serv. v. Crew*, 145 S. Ct. 1981 (2025) ...........................25
*United States v. Arthur*, 2020 WL 3073322 (D. Md. June 10, 2020)................16
*United States v. Briggs*, 2020 WL 3077171 (E.D. Pa. June 10, 2020)..............16
*United States v. Eaton Corp.*, 2024 WL 4513277 (6th Cir. Sept. 3, 2024).......15
*United States v. Langley*, 2016 WL 3855634 (D. Md. July 15, 2016)...............17
*United States v. McGowan*, 2020 WL 3867418 (6th Cir. June 28, 2020).........15
*United States v. McLaughlin*, 2021 WL 684044 (E.D. Pa. Feb. 22, 2021)......17
*United States v. Murdaugh*, 2025 WL 1039417 (4th Cir. Apr. 8, 2025)..........16
*United States v. Shipp*, 203 U.S. 563 (1906) ..............................................8
*United States v. Taylor*, 2020 WL 7264070 (D.D.C. Dec. 10, 2020)................16
*United States v. Texas*, 144 S. Ct. 797 (2024) .............................9, 12, 13, 14

Cases—continued:

*Yeshiva Univ. v. YU Pride All.*, 2022 WL 4127422 (U.S. Sept. 9, 2022) .........15
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .......................24
*Zheng v. Bondi*, 2025 WL 2808542 (D.N.J. Sept. 26, 2025) .............................15

## CONSTITUTION, STATUTES, AND RULE

U.S. Const. art. I, § 9, cl. 2 ....................................................................21
Alien Enemies Act, 50 U.S.C. § 21 .........................................................21
All Writs Act, 28 U.S.C. § 1651 ......................................................5, 8, 11
Fed. R. Civ. P. 26 ....................................................................................25

## OTHER AUTHORITIES

1st Cir. R. 18.0 (May 10, 2018)................................................................20
3d Cir. Standing Order Regarding Immigration Cases (Aug. 5, 2015)...........20
4th Cir. Standing Order 19-01 (Oct. 21, 2019) ........................................20
9th Cir. Gen. Order 6.4 (July 1, 2002).....................................................20
*Alvarenga-Leonor v. Baker*,
    No. 1:26-cv-52 (D. Md. Jan 8, 2026), Paperless Notice................................18
Amy Coney Barrett, *Procedural Common Law*,
    94 Va. L. Rev. 813 (2008)................................................................11
Rachel Bayefsky, *Administrative Stays: Power and Procedure*,
    97 Notre Dame L. Rev. 1941 (2022)...............................................12
D. Md. Standing Order 2025-01 ..............................................................19
D. Md. Am. Standing Order 2025-01 ........................................5, 6, 19, 22
D. Md. Second Am. Standing Order 2025-01............................................*passim*
D.C. Cir. Handbook of Practice and Internal Procedures VIII.A (2025) .......15
Defs' Mem. Law in Opp. to Plfs' Mot. TRO, *Abrego Garcia v. Noem*,
    No. 8:25-cv-951 (D. Md. Mar. 31, 2025), Dkt. 11 ........................................22
*The Need for Additional Judgeships: Litigants Suffer When Cases
    Linger*, U.S. Cts. (Nov. 18, 2024), https://tinyurl.com/ydm9tuuu ...............13
Order, *Woolard v. Sheridan*, No. 1:10-cv-2068 (D. Md. Mar. 30, 2012),
    Dkt. 63 ..........................................................................................16
Second Amended Standing Order 2025-01 Concerning Petitions for
    Writs of Habeas Corpus-Alien Detainee, *Chilel v. Bondi*, No. 1:26-
    cv-11 (D. Md. Jan. 5, 2026), Dkt. 2 ........................................................18

Other Authorities—continued:

Second Amended Standing Order 2025-01 Concerning Petitions for Writs of Habeas Corpus-Alien Detainee, *Lopez v. Bondi*, No. 1:26-cv-9 (D. Md. Jan. 5, 2026), Dkt. 2 ...................................................18

Second Amended Standing Order 2025-01 Concerning Petitions for Writs of Habeas Corpus-Alien Detainee, *Lopez-Lopez v. Noem*, No. 1:26-cv-8 (D. Md. Jan. 5, 2026), Dkt. 2 ...................................................18

*U.S. Dist. Cts. - National Judicial Caseload Profile*, U.S. Courts, https://tinyurl.com/msm4d67h .........................................................................13

## INTEREST OF AMICI CURIAE[1]

Amici curiae are nine retired federal judges from the U.S. District Court for the District of Maryland and other district courts and courts of appeals, as set out in the Appendix at the end of this brief. Amici have decades of experience adjudicating disputes and managing massive dockets of federal-court cases. Amici were appointed by Republican and Democratic presidents and hold diverse jurisprudential views. But amici all have a strong interest in defending the Judiciary's independence and protecting the exercise of district-court jurisdiction.

## INTRODUCTION

The government's "novel and potentially calamitous" lawsuit strikes at the heart of the judicial role. JA176. The government sought to enjoin every sitting judge of the United States District Court for the District of Maryland, the Clerk of Court, and the court itself ("Appellees") from employing a commonplace docket-management technique—the administrative stay. Specifi-

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than the amici curiae contributed money that was intended to fund preparing or submitting the brief. Pursuant to Fed. R. App. P. 29(a)(2), amici file this brief with the parties' consent.

cally, Appellees issued a standing order, followed by an amended standing order, imposing a brief, two-business-day administrative stay of removal in habeas cases. Federal courts at all levels routinely employ similar administrative stays to preserve their jurisdiction and provide time to consider the parties' submissions before the government's actions moot the case.

The district judge below (who had to be appointed from another district) rightly dismissed the government's suit, concluding that the government's claims were non justiciable, barred by judicial and sovereign immunity, and not authorized by any cause of action. JA176. Indeed, allowing the government's suit to proceed would have "pit[] two [coequal] branches against one another," threatening the separation of powers and portending a host of practical problems. JA181.

Following dismissal of the government's suit, Appellees issued a second amended standing order, making slight modifications to address the government's practical concerns while preserving the order's substance. The government then moved to dismiss its appeal, arguing that these changes had mooted the dispute. Dkt. 19-1 at 11. But the government also emphasized that it would "monitor" implementation of the second amended standing order and would "not hesitate to seek judicial relief," including through another "pre-

enforcement challenge," if it decided that the order infringed its "rights and interests." *Id.* at 9 n.6. Appellees, while agreeing the appeal should be dismissed, disagreed that the case is moot. Dkt. 22-1 at 2. This Court then declined to dismiss the appeal, reasoning that the case was "not moot." Dkt. 24 at 2.

Amici take no position on mootness, an issue the government renews in its opening brief. Rather, because the government has threatened to bring yet another facial challenge, amici write to explain how this unprecedented suit and any future ones like it would undermine the separation of powers. In particular, amici write to emphasize four points.

*First*, federal courts have long-standing, inherent authority to issue short administrative stays to preserve their jurisdiction. The government (at 4) does not argue otherwise. As amici can attest, these orders are essential to ensuring that overburdened district courts can manage their dockets by briefly preserving the status quo to provide time to rule on requests for emergency relief.

*Second*, the District of Maryland's most recent standing order fits as squarely into this paradigm as the initial standing orders did. Upon receipt of

a habeas petition and certain certifications, the order temporarily stays removal for just two business days so that the court can decide if it has jurisdiction. As the district court observed when discussing the prior version of the order, the order "effectively borrow[s] from the playbook of the federal courts of appeal," which impose automatic stays on immigration-related habeas petitions for longer periods of time. JA174.

*Third*, the government's suit—and the threat of similar lawsuits in the future—unabashedly interferes with the district court's authority to manage its docket, as well as its responsibility to determine its own jurisdiction. The suit therefore raises numerous separation-of-powers problems. As the district court recognized, those problems would only compound if the government's suit were allowed to proceed beyond the pleadings stage and coequal branches of government sought discovery from each other—an unprecedented clash between the Executive and Judiciary. JA176 n.3. Indeed, amici were never subject to such inter-branch discovery during their judicial service.

*Fourth*, in amici's judgment, the government's suit opens a Pandora's box of practical problems. Already overburdened judges must put aside their judicial responsibilities to defend themselves. Suing every sitting judge in a district also forces the appointment of an out-of-district judge, which saps the

resources of other districts as well. And the government's lawsuit places judges in the difficult position of finding conflict-free counsel willing to represent them against the Executive.

For all these reasons, and those in Appellees' brief, amici respectfully submit that this Court should affirm the district court's order granting Appellees' motion to dismiss.

## BACKGROUND

For the past year, the District of Maryland has been inundated with an "influx of habeas petitions" from "alien detainees" challenging allegedly "improper and imminent removal." D. Md. Second Am. Standing Order 2025-01, at 1. To manage this deluge of cases, the district court first issued a standing order on May 21, 2025, and amended it one week later. D. Md. Am. Standing Order 2025-01, at 1-2; *see also* JA8-9. The first amended standing order automatically and temporarily prevented the government from removing habeas petitioners "from the continental United States" or from "altering their legal status" for just two business days after the Clerk notified the government that the alien had filed a habeas petition. Am. Standing Order 2025-01, at 1-2.

The standing orders were rooted in the All Writs Act, 28 U.S.C. § 1651(a), which permits courts to "issue all writs necessary or appropriate in

aid of their respective jurisdictions and agreeable to the usages and principles of law." *Id.* at 1. The orders added that the Supreme Court has recognized "a limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *Id.* (quoting *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966)). Consistent with that authority, the district court issued the orders to "preserve existing conditions and the potential jurisdiction of [the] Court over pending matters while the Court determines the scope of its authority to grant the requested relief" and "to ensure" the court could appropriately evaluate the claims. *Id.*

The Department of Justice then filed an action in the District of Maryland on behalf of the United States and the Department of Homeland Security, facially challenging the standing orders. JA15-21. The government's unprecedented lawsuit named as defendants every sitting judge on the District of Maryland, the Clerk of Court, and even the district court itself. JA5-8. The government then filed a motion requesting that "each judge of this Court recuse himself or herself from this matter" and that the case be referred to the U.S. Court of Appeals for the Fourth Circuit for transfer to another dis-

trict or assignment of an out-of-district judge.  JA23.  The Chief Judge referred the motion to the Chief Judge of the Fourth Circuit, who appointed a Western District of Virginia judge to preside over the case.  JA179.  Thereafter, the government moved to preliminarily enjoin Appellees from implementing the standing orders in any case, and Appellees moved to dismiss.  JA179.

The district court dismissed the government's action for three reasons.  First, the government's lawsuit was non justiciable.  Because injunctions from one coequal tier of the judiciary against another did not exist at common law, the district court "lack[ed] the authority to enjoin [Appellees]."  JA185.  Second, sovereign immunity protected the district court, and judicial immunity shielded the judges and the Clerk.  JA188-98.  Third, the government had no cause of action to "sue a co-equal branch of government to vindicate a sovereign interest that is shared on both sides of the 'v.'"  JA201.  The government should have challenged the standing order through normal channels, either by appealing the order in a discrete habeas case or by petitioning the Judicial Council of the Fourth Circuit to quash the rule.  JA202-03.  Instead, the government chose the unprecedented and "more confrontational" path.  JA175.  That was plainly improper.

7

Following dismissal and after a notice-and-comment period, Appellees issued a second amended standing order, superseding the prior one. The new order tweaked language from the amended standing order to address the government's practical concerns, but its impact was substantially similar. The second amended standing order once again relied on the All Writs Act and the inherent judicial authority "to make orders to preserve the existing conditions and subject of the [habeas] petition." Second Am. Standing Order 2025-01, at 1 (quoting *United States v. Shipp*, 203 U.S. 563, 573 (1906)). Much like the prior orders enjoined the Executive from taking certain actions, the second amended standing order "SUSPENDS the authority of" the government to "remove Petitioner from the continental United States" or "change" the "Petitioner's legal status" in a way that "may deprive th[e] Court of subject matter jurisdiction over the Petition." *Id.* at 2. The administrative stay still lasts for just two business days. *Id.*

The second amended standing order reflects a few other changes. Instead of ordering the Clerk to automatically docket the order upon receipt of the petition, the new order directs the Clerk to docket the order only after notifying the parties that the petitioner has submitted the requisite documents asserting that he "is presently detained in Maryland, that emergency relief is

necessary, and that the Court has subject-matter jurisdiction over the Petition." *Id.* Additionally, the order makes clear that the "presiding judge may … dissolve the Order" or "extend or shorten this interval" as needed "'to make an intelligent decision'" about emergency relief. *Id.* (quoting *United States v. Texas*, 144 S. Ct. 797, 799 (2024) (Barrett, J., concurring)).

Soon after the District Court adopted the second amended standing order, the government moved to dismiss its appeal as moot. Dkt. 19-1 at 1, 8. Because the second amended standing order superseded the initial orders, the government argued that this Court "cannot now grant the government relief from them." *Id.* at 8. Appellees took no issue with the government's "decision to dismiss its appeal," but disagreed that the case was moot. Dkt. 22-1 at 2. Because the government "expressly reserved the right to challenge [the second amended standing order] facially," Appellees explained, the threat of continued litigation remains. *Id.* This Court denied the motion to dismiss, reasoning that the case was not moot. Dkt. 24 at 2.

**ARGUMENT**

The government's challenge to the District of Maryland's modest standing order is an extraordinary, unprecedented broadside against the judiciary's authority to preserve its jurisdiction, manage its docket, and briefly maintain

the status quo of pending controversies.  Despite the government's assertion (at 48-51) to the contrary, it is far from common or appropriate for the government to launch a facial challenge to a district court's standing order or administrative stay.  And the government has threatened to bring such a challenge again, if it determines the second amended standing order interferes with undefined executive-branch "rights and interests."  Dkt. 19-1 at 9 n.6.  Amici—who have among them decades of judicial experience—have never previously seen or been subject to such a lawsuit.  And for good reason:  As Appellees correctly argue in their opposition brief, this lawsuit is (i) not justiciable because it is a suit by the United States against the United States, (ii) barred by judicial and sovereign immunity, (iii) not grounded in any cause of action, and (iv) fails on the merits.  Dkt. 32 at 18-21.

Those fatal flaws aside, amici write to emphasize that the government's lawsuit, if allowed to proceed, would seriously disrupt the separation of powers by intruding upon a core judicial power.  District courts have longstanding, inherent authority to issue administrative stays to preserve their jurisdiction and resolve controversies arising therein.  The brief, two-business-day administrative stay at issue here falls squarely within that authority.

Indeed, the government effectively concedes this point.  In its brief, the government acknowledges (at 4) that the second amended standing order "attempt[s] to address" the government's "jurisdictional and legal" concerns and "functions more like an administrative stay."  As discussed above, the second amended standing order is substantively similar to the prior versions.  Thus, if (as the government admits) the second amended standing order functions like an administrative stay, then the same is true of the prior versions of the order.  The government's concession thus underscores that its challenges to the prior orders—and any future challenges to the second amended standing order or any order like it—would intrude upon a basic judicial power.

## I.  Administrative Stays Are a Standard Tool for Federal Courts to Preserve Their Jurisdiction

By conceding (at 4) that the second amended standing order functions "like an administrative stay," the government implicitly recognizes that federal courts have authority to order brief stays to serve the administration of justice.  *See* Amy Coney Barrett, *Procedural Common Law*, 94 Va. L. Rev. 813, 844 & nn.90-91 (2008) (collecting cases).  This power arises out of courts' inherent authority to manage their dockets and is codified in the All Writs Act, 28 U.S.C. § 1651, which recognizes that federal courts may issue writs to pre-

serve their jurisdiction. *See, e.g.*, *Texas*, 144 S. Ct. at 798 n.1 (Barrett, J., concurring) (citing Rachel Bayefsky, *Administrative Stays: Power and Procedure*, 97 Notre Dame L. Rev. 1941, 1960-64 (2022)); *Texas v. U.S. DHS*, 2024 WL 5454617, at *1-2 (E.D. Tex. Aug. 26, 2024); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13, 16-17 (D.D.C. 2025). As discussed below, *infra* pp. 12-17, administrative stays (i) allow courts to briefly preserve the status quo so that courts can exercise their jurisdiction, (ii) give judges the necessary time to deliberate on emergency motions, and (iii) have become a routine aspect of case management. *See Texas*, 144 S. Ct. at 798-99 (Barrett, J., concurring).

*First*, administrative stays enable courts to protect their jurisdiction over emergency applications. By prohibiting parties from altering the status quo in "ongoing … [or] potential future proceedings," *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004) (footnote omitted), administrative stays allow courts to "protect their jurisdiction from [external] conduct" that would interfere with their "ability to carry out Article III functions," *see Procup v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986) (en banc). These temporary stays thus enable courts to retain jurisdiction to grant relief if it is ultimately warranted. *Texas*, 2024 WL 5454617, at *3.

*Second*, administrative stays give judges the necessary time to consider emergency applications. *See, e.g.*, *In re MCP No. 185*, 2024 WL 3491226, at *1 (6th Cir. July 12, 2024). While the government (at 54) is correct that granting a stay ordinarily requires consideration of four factors, including the applicant's likelihood of success on the merits, *see Nken v. Holder*, 556 U.S. 418, 434 (2009), courts use administrative stays to "defer weighing the *Nken* factors," *Oregon v. Trump*, 154 F.4th 1161, 1164 (9th Cir. 2025) (citation omitted). Because those factors are "not always easy to evaluate in haste, … an administrative stay buys the court time to deliberate." *Texas*, 144 S. Ct. at 798 (Barrett, J., concurring).

Amici know firsthand the importance of these brief stays, especially when faced with emergency petitions, because judges often face "crushing" "caseload[s]." *See The Need for Additional Judgeships: Litigants Suffer When Cases Linger*, U.S. Cts. (Nov. 18, 2024), https://tinyurl.com/ydm9tuuu. For example, in the District of Maryland, judges have an average of 537 cases pending. *See U.S. Dist. Cts. – National Judicial Caseload Profile* 20, U.S. Courts, https://tinyurl.com/msm4d67h.

Entering an administrative stay allows a court to manage its imposing docket and make an informed decision on an emergency application, while preserving the status quo. *See Texas*, 144 S. Ct. at 798-99 (Barrett, J., concurring). At the same time, an administrative stay "should last no longer than necessary to make an intelligent decision" in order to minimize any potential harm. *Id.* at 799. Administrative stays thus are a "flexible, short-term" instrument that effect a brief pause to allow courts to decide emergency motions. *Id.*; *see also Dietz v. Bouldin*, 579 U.S. 40, 45-47 (2016); *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). Without administrative stays, amici submit that effectively adjudicating emergency applications would become next to impossible for judges.

*Third*, contrary to the government's challenges to the prior orders (at 52-59) and its threat to challenge the second amended standing order, Dkt. 19-1 at 9 n.6, administrative-stay orders are neither unlawful nor aberrations. There is nothing "untoward in … entering a temporary administrative stay." *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020). Such stays are "routine

practice" throughout the federal-court system.  *See id.*  Accordingly, the Supreme Court,[2] courts of appeals (including this Court),[3] and district courts[4] all

[2] *E.g.*, *Rollins v. R.I. State Council of Churches*, 146 S. Ct. 402, 402 (2025); *Noem v. Abrego Garcia*, 2025 WL 1022673, at *1 (U.S. Apr. 7, 2025); *Dep't of State v. AIDS Vaccine Adv. Coal.*, 145 S. Ct. 753, 753 (2025) (recognizing past entry of administrative stay); *Murthy v. Missouri*, 2023 WL 6763585, at *1 (U.S. Oct. 13, 2023); *Yeshiva Univ. v. YU Pride All.*, 2022 WL 4127422, at *1 (U.S. Sept. 9, 2022); *June Med. Servs., LLC v. Gee*, 139 S. Ct. 661, 661 (2019).

[3] *E.g.*, *Chilel-Chilel v. Bondi*, 2026 WL 962462, at *1 n.1 (9th Cir. Apr. 9, 2026) (referencing "temporary administrative stay of removal"); *In re Trump*, 2025 WL 3623076, at *1 (D.C. Cir. Dec. 12, 2025); *Middle E. Broad. Networks, Inc. v. United States*, 2025 WL 1378735, at *1 (D.C. Cir. May 7, 2025) (en banc); *Does 1-26 v. Musk*, 2025 WL 910413, at *1 (4th Cir. Mar. 25, 2025); *United States v. Eaton Corp.*, 2024 WL 4513277, at *1 (6th Cir. Sept. 3, 2024); *United States v. McGowan*, 2020 WL 3867418, at *1 (6th Cir. June 28, 2020); *Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019); *Trump v. Vance*, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019); *Brady v. NFL*, 638 F.3d 1004, 1005 (8th Cir. 2011); *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 395 F. App'x 701, 702 (Fed. Cir. 2010); *Cobell v. Norton*, 2004 WL 603456, at *1 (D.C. Cir. Mar. 24, 2004); *Arnold v. Garlock, Inc.*, 278 F.3d 426, 433 (5th Cir. 2001) (recognizing past entry of administrative stay); *In re Grand Jury Procs. Subpoena to Testify to Wine*, 841 F.2d 230, 232 (8th Cir. 1988) (similar); *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1137 (D.C. Cir. 1988) (similar); *accord* D.C. Cir. Handbook of Practice and Internal Procedures VIII.A (2025) (The special panel "may enter an administrative stay of very short duration before receiving a response to give the Court more time to consider the matter.").

[4] *E.g.*, *Afr. Cmties. Together v. Noem*, 2025 WL 3759533, at *2 (D. Mass. Dec. 30, 2025); *Zheng v. Bondi*, 2025 WL 2808542, at *1 (D.N.J. Sept. 26, 2025); *Planned Parenthood Monte Mar, Inc. v. Ford*, 2025 WL 1210968, at *5-6 (D. Nev. Apr. 25, 2025); *Gallusz v. LLP Mortg., Inc.*, 2025 WL 1360771, at *2 (S.D. Cal. Apr. 15, 2025); *Nat'l Council of Nonprofits*, 763 F. Supp. 3d at 16-17; *Texas*, 2024 WL 5454617, at *2; *Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 WL 5221947, at *5-6 (D. Nev. Aug. 15, 2023).

use administrative stays to preserve the status quo and give the court time to review the relevant filings. Amici likewise used administrative stays for this purpose during their judicial tenure.[5]

There is also nothing improper about issuing standing orders to address categories of cases that require administrative stays or comparable relief as a default. To take a few examples, district courts have issued standing orders (i) to administratively stay certain cases during government shutdowns;[6] (ii) to extend speedy-trial deadlines or postpone trials during the COVID-19 pandemic;[7] and (iii) to stay certain post-conviction petitions pending the resolution

---

[5] *Cf. Barton v. Apartment Inv. & Mgmt. Co.*, 2007 WL 9782574, at *1-2 (D. Md. Dec. 19, 2007) (Williams, J.) (granting temporary stay); *United States v. Arthur*, 2020 WL 3073322, at *2 n.7 (D. Md. June 10, 2020) (Grimm, J.) (discussing postponement of proceedings pursuant to COVID-19 pandemic standing order); Order, *Woolard v. Sheridan*, No. 1:10-cv-2068 (D. Md. Mar. 30, 2012), Dkt. 63 at 2 (Legg, J.) (granting temporary stay of summary-judgment order until court could decide whether to issue full stay pending appeal).

[6] *E.g., In Furtherance of the Stay of Certain Civ. Cases Pending the Restoration of Dep't of Just. Funding*, 2025 WL 2958755, at *1 (S.D.N.Y. Oct. 17, 2025); *Henry J. v. Green*, 2019 WL 13319444, at *1 n.3 (D.N.J. Jan. 29, 2019); *Rodriguez v. Berryhill*, 2019 WL 7403978, at *2 n.2 (S.D.N.Y. Jan. 22, 2019).

[7] *E.g., United States v. Murdaugh*, 2025 WL 1039417, at *1 (4th Cir. Apr. 8, 2025) (discussing D.S.C. COVID-19 standing orders); *United States v. Briggs*, 2020 WL 3077171, at *2 (E.D. Pa. June 10, 2020); *United States v. Taylor*, 2020 WL 7264070, at *2-3 (D.D.C. Dec. 10, 2020).

of relevant appeals.[8]  In each example, courts appropriately managed their dockets by adopting standing orders to address recurring categories of cases.

## II. The District of Maryland's Standing Orders Fit within this Inherent Authority and Follow Accepted Practice

The District of Maryland's standing orders fall squarely within a court's authority to preserve its jurisdiction and manage its docket.  Start with the second amended standing order, which is currently in force.  This order imposes a temporary, two-business-day stay upon a petitioner's request and accompanying certification of certain facts relevant to the court's jurisdiction.  Second Am. Standing Order 2025-01, at 2.  During that two-business-day period, the stay "suspends" the government's power to remove the petitioner from the continental United States.  *Id.* (capitalization omitted).  The presiding judge may extend or shorten the stay, and the government may seek dissolution of the stay upon a showing of good cause.  *Id.*  The short pause simply ensures that the court has time to decide if it has jurisdiction over the petition before the petitioner is removed from the country.

---

[8] *E.g.*, *United States v. McLaughlin*, 2021 WL 684044, at *4 (E.D. Pa. Feb. 22, 2021); *United States v. Langley*, 2016 WL 3855634, at *2 (D. Md. July 15, 2016).

The second amended standing order works as intended. District courts have entered the order at the request of the petitioner with accompanying certifications, and the order has expired at the end of the two-business-day period unless the judge ordered otherwise. *E.g.*, *Lopez-Lopez v. Noem*, No. 1:26-cv-8 (D. Md. Jan. 5, 2026), Dkt. 2; *Lopez v. Bondi*, No. 1:26-cv-9 (D. Md. Jan. 5, 2026), Dkt. 2; *Chilel v. Bondi*, No. 1:26-cv-11 (D. Md. Jan. 5, 2026), Dkt. 2. And judges have declined to impose the second amended standing order when the petitioner fails to comply with the certification requirement. *E.g.*, *Alvarenga-Leonor v. Baker*, No. 1:26-cv-52 (D. Md. Jan 8, 2026), Paperless Notice.

Although the government submitted a comment strenuously opposing the second amended standing order, Dkt. 22-2 at 1-3, the government does not explicitly criticize this order in its brief and instead dangles the possibility of bringing "a new pre-enforcement challenge," Dkt. 19-1 at 9 n.6. At the same time, though, the government (at 3-4) concedes that the second amended standing order "cur[ed] procedural flaws in the original." Even though the government "has conspicuously declined to say" that the second amended standing order otherwise completely "destroyed the basis for its" claims, Dkt. 32 at 39, any future facial challenge would be baseless given the government's admissions concerning the current order. Specifically, the government admits

(at 4) that the second amended standing order "attempt[s] to address the jurisdictional and legal deficiencies that the government identified," and "functions more like an administrative stay."

But the second amended standing order is similar in kind to the prior standing orders, making the government's continued objections (at 52-59) to the first two (superseded) standing orders hard to credit. Like the second amended standing order, the prior standing orders also imposed a two-business-day pause on proceedings to ensure the petitioner was not removed from the continental United States before the district court could determine if it had jurisdiction. *See* D. Md. Standing Order 2025-01, at 1; Am. Standing Order 2025-01, at 2. To be sure, the second amended standing order uses the word "suspend" instead of "enjoin"; requires the Clerk to wait for the petitioner to certify certain facts before docketing the order; and expressly states that the presiding judge may dissolve the order upon the government's showing of good cause. Second Am. Standing Order 2025-01, at 2. In the main, however, the second amended standing order functions in a substantially similar way as the prior orders.

Nor is the District of Maryland's standing order the "first-of-its-kind." *Contra* Gov't Br. 1. Several courts of appeals—including this Court—have

long imposed automatic administrative stays of removal ranging from ten business days to the date of the court's decision.[9]  JA174.  The government identifies no disruption from those circuit orders, which have been in place for years.  And, as the district court recognized, the standing order here "borrow[s] from th[at] playbook" but is "considerably more modest" than the circuit orders because it only presses pause for two business days.  *See* JA174 (discussing amended standing order).

## III.  The Government's Threatened Challenge of the Standing Order Endangers the Separation of Powers

Although the government is apparently not challenging the second amended standing order in this appeal, its lawsuit and the possibility of future lawsuits of the same ilk are treacherous.

---

[9] 1st Cir. R. 18.0 (May 10, 2018) (directing clerk to enter an "administrative order staying removal for ten business days"); 3d Cir. Standing Order Regarding Immigration Cases (Aug. 5, 2015) (directing administrative stay "until such time as a motions panel can consider the motion"); 4th Cir. Standing Order 19-01 (Oct. 21, 2019) (directing clerk to "enter an administrative order staying removal for a period of 14 days"); 9th Cir. Gen. Order 6.4(c)(1) (July 1, 2002) ("Upon the filing of an initial motion or request for stay of removal or deportation, the order of removal or deportation is temporarily stayed until further order of the Court."); *cf. In re Immigr. Petitions for Rev. Pending in the U.S. Ct. of Appeals for the Second Cir.*, 702 F.3d 160, 162 (2d Cir. 2012) (recognizing government's "forbearance policy" pausing removals during pending appeals).

**A. If Successful, the Government Could Evade Judicial Review of Its Actions**

Based on their decades of hands-on experience, amici emphasize that the government's attempt to interfere with courts' ability to protect their own jurisdiction would raise serious separation-of-powers questions. If courts cannot enter brief administrative stays while considering emergency applications, then the Executive can simply act to deprive the court of jurisdiction as soon as a case is filed. In so doing, the Executive would effectively immunize itself from judicial review and prevent courts from fulfilling their constitutionally mandated role.

Habeas petitions make this concern all-the-more acute. "The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969). So important is the writ that the Constitution generally prohibits its suspension. U.S. Const. art. I, § 9, cl. 2. And the writ plays a critical role in challenges to the Executive's detention and removal of individuals under the Alien Enemies Act, 50 U.S.C. § 21, since such challenges "must be brought in habeas" in the district where the individual is confined, *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (citation omitted).

The Executive has taken the position, however, that once it removes an individual from the country, federal courts no longer have jurisdiction to decide that individual's habeas petition. *See* Defs' Mem. Law in Opp. to Plfs' Mot. TRO, *Abrego Garcia v. Noem*, No. 8:25-cv-951 (D. Md. Mar. 31, 2025), Dkt. 11 at 5-8; *but see Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1019 (2025) (Sotomayor, J., statement respecting disposition of application) (disagreeing with that view). If the government is correct, then it can always evade habeas review simply by removing the detainee from the country before the district court can review the petition. The standing order prevents that outcome by ordering a brief two-business-day pause "to preserve existing conditions and the potential jurisdiction of [the] Court over pending matters while the Court determines the scope of its authority to grant the requested relief." Second Am. Standing Order 2025-01, at 1; *accord* Am. Standing Order 2025-01, at 1.

Consider a habeas petition filed on a Monday. The government could immediately begin taking steps to remove the petitioner from the United States. If the government were to accomplish that end by Tuesday, then it would have stripped the district court of jurisdiction before the court had any practical opportunity to determine if it had jurisdiction over the petition in the first place. Without a temporary stay, the filing of a habeas petition thus would

start a race between the government (to transfer the detainee out of the country) and the district court (to execute its constitutional and statutory obligations). Multiply that dynamic by the thousands, and the district court would become a hastily run enterprise, rushing to issue orders before cases disappear from its jurisdiction. The government's position thus would undercut the Judiciary's "virtually unflagging" obligation to resolve cases within its jurisdiction. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citation omitted).

The government fails to grapple with the implications of its expansive position. It asserts (at 1) that it merely seeks to invalidate a judicial mechanism that "harmed the Executive Branch's enforcement of federal law." But that reasoning ignores the Judiciary's independent constitutional role. *See* JA181-83. Taken to its logical conclusion, the government's theory would allow the Executive to block any effort by the Judiciary that happens to frustrate the Executive's prerogatives. In amici's judgment, that "constitutional free-for-all" would be devastating to the efficacy of the Nation's courts. *See* JA183.

If the government's lawsuit succeeds, many longstanding rules maintained by courts nationwide would be at risk. As explained, *supra* n.9, this

Court and other courts of appeals maintain analogous (and generally more restrictive) standing rules. If the government's theory were accepted here, nothing would stop executive-branch suits against circuit judges to enjoin their rules. Similarly, the Supreme Court sometimes issues administrative stays that implicate Executive powers. *E.g.*, *Abrego Garcia*, 2025 WL 1022673, at *1. The government's theory thus apparently would allow the Executive to sue the Justices and the Supreme Court too. JA195. But the government offers no hint of who would even resolve such a controversy if, for example, it named as a defendant every Supreme Court Justice. That the government's theory portends such "a patently absurd result" only underscores its infirmity. JA195.

## B. Permitting This Lawsuit to Continue Would Create Unnecessary Friction Between Two Coequal Branches

Permitting the government's suit to proceed would "pit[]" the Executive and Judiciary "against one another." JA181. Although some friction between branches is "inevitable" in a system of checks and balances, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 614 (1952) (Frankfurter, J., concurring) (citation omitted), the government's suit goes much further by intruding upon the Judiciary's inherent authority to manage its dockets and protect its jurisdiction. *Supra* pp. 21-24.

The separation-of-powers problems would only get worse if the government's lawsuit were to proceed to discovery. The Executive could seek to depose the judges, serve interrogatories and requests for admission, and request documents from the judicial branch like emails, text messages, internal memoranda, and meeting minutes. *See* Fed. R. Civ. P. 26(b)(1). Similarly, the judges could seek discovery relevant to this litigation from "principal officers of the Executive, including the Secretary of Homeland Security and the United States Attorney General." JA176 n.3. For instance, the judges could seek to depose the government's declarant about the alleged difficulties created by the standing order. *See* JA55-59.

Such discovery "would almost certainly trigger claims of privilege—executive, judicial, deliberative-process, and the like," JA176 n.3—placing the Executive and Judiciary on a "collision course," *e.g.*, *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 389 (2004); *U.S. Doge Serv. v. Crew*, 145 S. Ct. 1981, 1982 (2025). Moreover, discovery could tread into the subjective motivations behind either the court's standing order or the government's lawsuit or immigration policies, amounting to a "substantial intrusion" that "should normally be avoided" under separation-of-powers principles. *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation omitted). In all their years on the bench, amici were

never subject to such discovery, nor did they oversee comparable discovery in any of their cases.

## IV.   The Government's Lawsuit Creates Myriad Practical Problems

On top of violating core separation-of-powers principles, the government's scorched-earth litigation tactics threaten federal courts' performance of their constitutional obligations.  Rather than challenge the standing order in a particular habeas case, the government opted to sue every sitting judge, the Clerk of Court, and the court itself.  The government thus "ensnared an entire judicial body—a vital part of this coordinate branch of government— and its principal officers in novel and potentially calamitous litigation." JA175-76.  This approach wastes scarce judicial resources and diverts judges' time and energy from deciding cases to defending themselves.  *Cf. Bradley v. Fisher*, 80 U.S. (13 Wall) 335, 348-49 (1871) (discussing similar policies underlying judicial immunity).  The government's suit also "required the recusal of the entire federal bench in the District of Maryland and the assignment of [an] out-of-district judge." JA176 n.3.  The appointed judge was likewise diverted from deciding cases in his own district, expanding the drain on judicial resources.

Given their knowledge of the substantial responsibilities of sitting judges, amici can attest that lawsuits against a district's entire bench and the court itself would be highly disruptive and distracting. Amici add that the distraction created by the government's suit harms not only the Judiciary, but also other litigating parties and the public, who deserve the prompt resolution of disputes.

The government's approach also would create myriad difficulties for the judges sued. Finding counsel would be difficult, as many local attorneys would be conflicted due to pending matters in the district. As happened here, judges would likely need to reach beyond their district to find conflict-free counsel. *See* JA312 (pro hac vice motions for judges' counsel). Although appellees here retained highly skilled, conflict-free counsel, that outcome becomes less likely if the government files facial challenges to standing rules in other courts. If the government's strategy becomes commonplace, the judges whom it later sues will be hard-pressed to find adept, conflict-free counsel. These practical considerations make evident the patent impropriety of the government's lawsuit.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

/s/ *Lisa S. Blatt*
PETER J. KAHN
LISA S. BLATT
MATTHEW B. NICHOLSON
JAMES N. SASSO
ERIN M. SIELAFF
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

MAY 6, 2026

# CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Lisa S. Blatt, counsel for amici curiae Retired Federal Judges and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Amici Curiae Retired Federal Judges in Support of Defendants-Appellees, is proportionately spaced, has a typeface of 14 points or more, and contains 5,834 words.

/s/ *Lisa S. Blatt*
LISA S. BLATT

MAY 6, 2026

# CERTIFICATE OF SERVICE

I, Lisa S. Blatt, counsel for amici curiae Retired Federal Judges and a member of the Bar of this Court, certify that, on May 6, 2026, a copy of the attached Brief of Amici Curiae Retired Federal Judges in Support of Defendants-Appellees was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ *Lisa S. Blatt*
LISA S. BLATT

MAY 6, 2026

# Appendix: List of Amici

Judge Robert J. Cindrich, U.S. District Court for the Western District of Pennsylvania (Ret.)

Judge Andre M. Davis, U.S. District Court for the District of Maryland & U.S. Court of Appeals for the Fourth Circuit (Ret.)

Judge Jeremy D. Fogel, U.S. District Court for the Northern District of California (Ret.)

Judge Paul W. Grimm, U.S. District Court for the District of Maryland (Ret.)

Judge Benson Everett Legg, U.S. District Court for the District of Maryland (Ret.)

Judge J. Michael Luttig, U.S. Court of Appeals for the Fourth Circuit (Ret.)

Judge William N. Nickerson, U.S. District Court for the District of Maryland (Ret.)

Judge Paul J. Watford, U.S. Court of Appeals for the Ninth Circuit (Ret.)

Judge Alexander Williams, Jr., U.S. District Court for the District of Maryland (Ret.)